In re: **METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION**

No. 00–Civ. 1898(BS).

United States District Court, S.D. New York.

Aug. 20, 2001.

Morris A. Ratner, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, for Liaison Counsel.

Lewis J. Saul, Jon Hinck, Lewis Saul & Associates, P.C., Washington, DC, Robert Gordon, Mitchell M. Breit, John M. Broaddus, Weitz & Luxenberg, P.C., New York City, A. Hoyt Rowell, Ness, Motley, Loadholt, Richardson & Poole, Mt. Pleasant, SC, for the Berisha and La Susa Plaintiffs.

Morris A. Ratner, Elizabeth J. Cabraser, Lieff, Cabraser, Heimann & Bernstein, LLP, New York City, Joe R. Whatley, Jr., Whatley Drake, L.L.C., Birmingham, AL, Dennis C. Reich, Reich & Binstock, Houston, TX, Timothy Crowley, Crowley & Douglas, Houston, TX, A. Hoyt Rowell, T. Christopher Tuck. Ness, Motley, Loadholt, Richardson & Poole, Mt. Pleasant, SC, C. Anthony Graffeo, Cory, Watson, Crowder & Degaris, Birmingham, AL, Mitchell A. Toups, Weller, Green, McGown & Toups, Beaumont, TX, for the Young Plaintiffs.

Stephen M. Tillery, Steven A. Katz, Michael B. Marker, Carr, Korein, Tillery, et al., Belleville, IL, Scott Summy, Celeste Evangel, Cooper & Scully, PC, Dallas, TX, for the England Plaintiffs.

Kenneth F. McCallion, Goodkind Labaton Rudoof & Sucharow LLP, New York City, for the Berrian Plaintiffs.

Peter Sacripanti, McDermott, Will & Emery, New York City, for Liaison Counsel.

Robert H. Shulman, Mindy G. Davis, Brent H. Allen, Howrey Simon Arnold & White LLP, Washington, DC, Christopher S. Colman, Rebecca L. Batchelder, Amera-

da Hess Corporation, Woodbridge, NJ, for Amerada Hess Corp.

Richard C. Godfrey, J. Andrew Langan, Mark S. Lillie, Kirkland & Ellis, Chicago, IL, for Atlantic Richfield Co.

Richard C. Godfrey, J. Andrew Langan, Mark S. Lillie, Kirkland & Ellis, Chicago, IL, for BP Corp. North America, Inc. & Amoco Oil Co.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, DC, Dan E. Ball, Edward Cohen, Roman Wuller, Thompson Coburn LLP, St. Louis, MO, for Chevron USA, Inc.

Nathan P. Eimer, Pamela R. Hanebutt, Lisa S. Meyer, Eimer Stahl Klevorn & Solberg, Chicago, IL, for Citgo Petroleum Corp.

Dan H. Ball, Edward Cohen, Roman Wuller, Thompson Coburn LLP, St. Louis, MO, for Conoco, Inc.

Robert H. Shulman, Mindy G. Davis, Brent H. Allen, Howrey Simon Arnold & White, Washington, DC, Robert E. Kelley, Jr., Houston, TX, for El Paso CGP Co.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, DC, for Equilon Enterprises, LLC.

Peter Sacripanti, Craig H. Zimmerman, James A. Pardo, McDermott, Will & Emery, New York City, Dan H. Ball, Edward Cohen, Roman Wuller, Thompson Coburn LLP, St. Louis, MO, David B. Weinstein, Kimberly Staffa Mello, Bales & Weinstein, P.A., Tampa, FL, for Exxon Mobil Corp.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, DC, for Motiva Enterprises, LLC.

Robert H. Shulman, Mindy G. Davis, Brent H. Allen, Howrey Simon Arnold & White, Washington, DC, for Phillips Petroleum Co.

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, DC, John E. Galvin, Fox Galvin, LLC, St. Louis, MO, for Shell Oil Co. and Shell Oil Products Co.

John S. Guttmann, Sy Gruza, Heather Andrade, Beveridge & Diamond, P.C., Washington, DC, for Sunoco, Inc. (R & M).

Richard E. Wallace, Jr., Anthony F. King, Peter C. Condron, Wallace King Marraro & Branson, Washington, DC, for Texaco Inc. and Texaco Refining and Marketing, Inc.

Kenneth Pasquale, Melvin A. Brosterman, Christine Fitzgerald, Stroock, Stroock & Lavan LLP, New York City, for Tosco Corp.

Edward S. Weltman, Jonathan Price, Christopher J. Garvey, Schneck Weltman & Hashmall LLP, New York City, for United Refining Corp.

Kenneth M. Bialo, Matthew McCoy, Baker Botts LLP, New York City, for Valero Marketing and Supply Co.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

This consolidated multi-district litigation comprises several putative class actions brought on behalf of private well-owners seeking relief from the contamination or threatened contamination of their wells. Although the allegations of each action are somewhat different, the common charge is essentially the same: defendants, petroleum companies doing business throughout the United States, knowingly caused the widespread contamination of groundwater as a result of their use of a gasoline additive known as methyl tertiary butyl ether

("MTBE").[1] Although certain named plaintiffs seek compensatory and/or punitive damages, the relief sought by the putative classes consists primarily of a court-supervised program of MTBE testing, monitoring, education, and, where appropriate, the provision of clean water and/or remediation.

Now before this Court are defendants' motions to dismiss.[2] For the reasons set forth below, defendants' motions are denied in part and granted in part.

## II. FACTUAL BACKGROUND [3]

### A. MTBE

MTBE is a chemical compound designed to increase the oxygen content of gasoline. It is produced from methanol and isobutylene, a by-product of the gasoline-refining process. *See* MC ¶ 39. MTBE is highly soluble and travels faster and farther in water than other gasoline components. *See id.* ¶¶ 37, 48, 49. As a result, whenever MTBE is released into the environment it has the ability to infiltrate underground water reservoirs and contaminate wells drawing from underground aquifers. *See id.* ¶ 49. MTBE's foul taste and odor render water unusable and unfit for human consumption. *See id.* ¶ 51. The chemical make-up of MTBE also allows it to persist in underground aquifers for decades at a time. *See id.* ¶ 50. MTBE is a known animal carcinogen that has been linked to many potential human health problems. *See id.* ¶ 54. The United States Environmental Protection Agency ("EPA") has classified MTBE as a possible human carcinogen. *See id.*

Every year over nine million gallons of gasoline with MTBE escape into the environment during transportation, storage, sale or use in the United States. *See id.* ¶ 56. Thousands of gallons also enter the ground from gas stations due to consumer overfills of gas tanks, as well as jobber overfills of underground storage tanks ("UST's"). *See id.* ¶ 58. In addition, MTBE can reach the ground through rainfall.[4] *See id.* ¶ 60.

---

**1.** The named defendants include: Amerada Hess Corp. ("Amerada Hess"); Atlantic Richfield Co. ("Arco"); BP Corp. North America, Inc. ("BP Corp.") (formerly BP Amoco Corp.); Amoco Oil Co. ("Amoco"); Chevron U.S.A., Inc. ("Chevron"); CITGO Petroleum Corp. ("Citgo"); Conoco Inc. ("Conoco"); El Paso CGP Co. ("El Paso") (formerly The Coastal Corp.); Equilon Enterprises, LLC ("Equilon"); Exxon Mobil Corp. ("Exxon–Mobil"); Motiva Enterprises, LLC ("Motiva"); Phillips Petroleum Co. ("Phillips"); Shell Oil Co. ("Shell"); Shell Oil Products Co. ("Shell Products"); Sunoco, Inc. (R & M) ("Sunoco"); Texaco Inc. ("Texaco"); Texaco Refining and Marketing, Inc. ("Texaco Refining"); Tosco Corp. ("Tosco"); United Refining Co. ("United Refining"); Valero Marketing and Supply Co. ("Valero"); and Does 1–100 (collectively "the defendants"). Not all of these defendants are named in each action.

**2.** The parties were directed to submit joint notices of motion and memoranda of law in support of and in opposition to the motions to dismiss. The defendants were permitted, however, to submit supplemental memoranda addressing issues not addressed in the joint submissions that are unique to their particular case.

**3.** In an effort to streamline these proceedings, plaintiffs were directed to file a Master Complaint ("MC") setting forth all allegations and causes of action asserted against the defendants. The plaintiffs in each individual action then filed amended complaints adopting the allegations and causes of action applicable to their individual case. For purposes of the present motions, the facts alleged by the plaintiffs are assumed to be true. *See ICOM Holding, Inc. v. MCI Worldcom, Inc.,* 238 F.3d 219, 221 (2d Cir.2001).

**4.** MTBE's volatility allows the chemical to evaporate into the atmosphere, mix with water vapor, and return to earth during rainfall. *See* MC ¶ 60.

## B. The Reformulated Gasoline Program

In 1990, Congress established the Reformulated Gasoline Program ("RFG Program") in section 211(k), 42 U.S.C. § 7545(k), of the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 et seq. The RFG Program was enacted to help reduce ozone forming volatile organic compounds ("VOC's") and emissions of toxic air pollutants. See 42 U.S.C. § 7545(k)(1). In furtherance of this purpose, the RFG Program requires the use of reformulated gasoline in the nine largest metropolitan areas with the most severe summertime ozone levels and other ozone non-attainment areas that opt into the program.[5] See 42 U.S.C. § 7545(k)(6) and (10)(D). Section 7545(k)(1) directs the EPA, the agency charged with overseeing the RFG Program, to issue regulations

> requir[ing] the greatest reduction in emissions of ozone forming volatile organic compounds (during the high ozone season) and emissions of toxic air pollutants during the entire year achievable through the reformulation of conventional gasoline, taking into consideration the cost of achieving such emission reductions, any non air-quality and other air-quality related health and environmental impacts and energy requirements.

42 U.S.C. § 7545(k)(1). In contrast with conventional gasoline, reformulated gasoline is required to contain an increased chemical oxygen content, enabling the fuel to burn cleaner and thus reduce the emission of VOC's. The RFG Program requires that reformulated gasoline consist of at least 2.0% oxygen by weight. See 42 U.S.C. § 7545(k)(2). The CAA also requires that gasoline contain 2.7% oxygen by weight during the wintertime in areas that are not in attainment for the NAAQS for carbon monoxide. See 42 U.S.C. § 7545(m).

In order to meet the required oxygen level, gasoline manufacturers add oxygenates such as MTBE to the gasoline. See MC ¶ 40. Gasoline with MTBE has been certified by the EPA for use in the RFG Program pursuant to section 7545(k)(4) and MTBE is currently the oil industry's "oxygenate of choice." Id. ¶ 130. Today, MTBE comprises up to 15% of every gallon of gasoline sold in the designated non-attainment areas. See id. ¶ 131.

## C. Defendants' Knowledge and Activities

Defendants began manufacturing, distributing and selling gasoline containing MTBE in the late 1970's. See id. ¶ 41. By the mid–1980's, MTBE was in widespread use in high-octane gasoline. See id. ¶ 42. After the enactment of the RFG Program, defendants began adding MTBE to gasoline in much greater concentrations, typically 11 to 15%. See id. ¶ 43.

### 1. Defendants' Knowledge of the Threat to Groundwater Caused by MTBE

Plaintiffs allege that the defendants were aware or should have been aware of the threat to groundwater caused by adding MTBE to gasoline. Defendants were

---

**5.** The CAA requires the creation of national air quality standards for six air pollutants. See 42 U.S.C. § 7409; 40 C.F.R. §§ 50.2(a), 50.4–50.12. These six pollutants are: carbon monoxide, lead, ozone, sulfur dioxide, nitrogen dioxide, and particulate matter. See 40 C.F.R. §§ 51.852, 50.4–50.12. Air quality control regions throughout the country are rated based on whether they meet the National Ambient Air Quality Standards ("NAAQS") for each of these designated pollutants. See 42 U.S.C. § 7407(d). Regions which do not meet the mandated levels for any of the criteria pollutants are designated "non-attainment areas." 42 U.S.C. §§ 7407(d), 7501(2).

aware of specific incidents of MTBE groundwater contamination as early as 1980. *See id.* ¶¶ 66–70, 73–74. By 1984, defendants, including Exxon,[6] Shell and Chevron, were exchanging information concerning MTBE contamination in Maryland, New York, and Rhode Island dating back to 1978. *See id.* ¶ 74. In March 1987, defendants became aware of MTBE contamination in six different locations along the eastern seaboard. *See id.* ¶ 75. In addition, defendants had knowledge of two major incidents in Liberty, New York and East Patchogue, New York, occurring respectively in 1988 and 1990. *See id.* ¶¶ 76–77, 79.

Defendants were also cognizant of scientific studies describing the dangers of MTBE. In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection authored an environmental report entitled *Methyl Tertiary Butyl Ether as a Ground Water Contaminant* (the "Garrett Report"), which detailed the threat posed to groundwater by MTBE and recommended that MTBE be banned as a gasoline additive, or at the very least, be stored in double-contained facilities. *See id.* ¶¶ 82–83. A draft of this report was circulated throughout the oil industry. *See id.* ¶ 84. On December 23, 1986, a staff employee with the Groundwater Technical Task Force ("GTTF")[7] forwarded the Garrett Report to its members, including representatives of Shell, Arco and Exxon, seeking their comments. *See id.* ¶ 86. The comments from the GTTF members culminated in a letter sent to the National Well Water Association, the organization which was to present the Garrett Report, disputing the Garrett Report's findings and recommendations. *See id.* ¶ 87.

While publicly disputing the findings of the Garrett Report, the plaintiffs allege that the defendants privately acknowledged the report's validity. In a letter dated February 4, 1987, Arco Chemical, at the time a division of Arco, stated that it had no data refuting the findings of the Garrett Report. *See id.* ¶ 90. That same year, concerns regarding the dangers of MTBE were echoed in memoranda prepared by Mobil and Chevron. *See id.* ¶¶ 91–92. In 1992, Shell employees prepared a memorandum entitled the *MTBE WHITE PAPER—the Impact of MTBE on Groundwater,* which acknowledged that MTBE was nearly twenty-five times more soluble than benzene (another chemical component of gasoline), MTBE does not biodegrade in the subsurface environment, and the increased use of MTBE would lead to heightened concerns over the management of accidental gasoline releases in the future. *See id.* ¶¶ 94–95. Another Shell document dated June 1997 observed the difficulty in removing MTBE from ground water in comparison to other gasoline components. *See id.* ¶ 96. In May 1999, Chevron employees further discussed concerns relating to the use of MTBE in a report entitled *Solving Problems From MTBE Contamination—It's Not Just Regulating Underground Tanks. See id.* ¶ 97.

### 2. Defendants' Conspiracy to Mislead the EPA and the Public

Although the defendants were aware of the dangers associated with MTBE, plaintiffs allege that the defendants conspired

---

6. Exxon–Mobil was formed as a result of the merger on November 30, 1999 of Exxon Corp. ("Exxon") and Mobil Corp. ("Mobil"). *See* MC ¶ 16.

7. The GTTF was created by the American Petroleum Institute ("API"), a trade association representing the petroleum industry (including defendants) in a broad range of topics. *See* MC ¶ 67.

to mislead the EPA and the public in an effort to convince them of the desirability of increasing concentrations of MTBE in gasoline. In 1986, the federal Interagency Testing Committee ("ITC")[8] recommended that the EPA conduct testing of MTBE in order to assess MTBE's health and environmental risks. *See id.* ¶ 100. The ITC invited written comments on this subject. *See id.* According to the plaintiffs, the defendants mobilized to convince the EPA that additional testing of MTBE was unnecessary. *See id.* ¶ 101.

On or about December 12, 1986, Arco, speaking on behalf of and/or with the approval of the other defendants, responded to the ITC's recommendation by discrediting the information relied upon by the ITC, and intentionally downplayed the risks associated with MTBE by stating that MTBE is only slightly soluble in water. *See id.* ¶ 102. At a public focus meeting held a few days later, Arco and Exxon made presentations supporting the industry position that additional medical testing was unnecessary. *See id.* ¶ 103. In early 1987, defendants formed the MTBE Committee for the purpose of addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE. *See id.* ¶ 104. Members of the MTBE Committee included Amoco, Arco, Chevron, Citgo, Exxon, Shell, Sunoco, Texaco and Conoco. *See id.* ¶ 105. Defendants also formed the MTBE Technical Subcommittee in an effort to coordinate the oil industry's response to EPA concerns relating to MTBE. *See id.*

Plaintiffs allege that the defendants were not forthcoming in their responses to the EPA's inquiries concerning MTBE. *See id.* ¶ 107. On February 27, 1987, the MTBE Committee provided information to the EPA representing that MTBE was only slightly soluble in water, potential environmental exposure to MTBE was low, and that MTBE had excellent biodegradation characteristics—all of which defendants knew to be false or misleading. *See id.* ¶¶ 107–08. In addition, the MTBE Committee submitted written comments to the EPA stating that there was no evidence that MTBE posed any significant risk of harm to public health or the environment. *See id.* ¶ 109. One year after successfully convincing the EPA that further testing of MTBE was unnecessary, the MTBE Committee disbanded. *See id.* ¶ 115.

Plaintiffs also allege that the defendants misled the public. In April 1987, George Dominguez of the MTBE Committee gave a presentation at a Conference on Alcohol and Octane in which he withheld information relating to MTBE and stated that MTBE gasoline spills have been dealt with effectively. *See id.* ¶ 124. In 1994, the API responded to an article raising questions about the environmental and health benefits of MTBE by stating that there was no basis to question the continued use of MTBE. *See id.* ¶ 125. In an April 1996 pamphlet distributed by the Oxygenated Fuels Association ("OFA"), an alleged agent of the defendants, the OFA expressed confidence that federal regulations and industry practices made MTBE contamination a thing of the past and, in fact, suggested that any MTBE groundwater contamination may provide a public service, as it "can serve as an early indicator *of gasoline contamination in groundwater,* triggering its cleanup and remediation, and limiting the probability of harm from the usual constituents of gasoline." *Id.* ¶¶ 126–27.

---

**8.** The ITC was established pursuant to the Toxic Substances Control Act, 15 U.S.C. §§ 2601 *et seq. See* MC ¶ 100.

### D. The Effects of Adding MTBE to Gasoline

The United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected chemical in groundwater in the United States. *See id.* ¶ 139. According to a report by a special EPA Blue Ribbon Panel, MTBE is a "threat to the nation's drinking water resources", has "caused widespread and serious contamination" of the nation's groundwater, and has been found in 21% of ambient groundwater tested in non-attainment areas where MTBE is used. *See id.* ¶ 145. In October 1998, the state of Maine issued a report presenting the results of tests taken from 951 randomly selected private wells. *See id.* ¶ 144. MTBE was detected in 15.8% of the wells sampled and 1.1% of the wells sampled had MTBE levels exceeding Maine's drinking water standard. *See id.*

In New York, MTBE has been found in drinking water at levels near or above New York's safe drinking water standard in twenty-four different towns. *See id.* ¶ 140. In 1997, the USGS found MTBE in 125 of 1100 private wells randomly tested in New York, three of which had concentrations in excess of New York's safe drinking water standard. *See id.* ¶ 141. In July 1999, the New York State Department of Health randomly tested water from 111 private wells, many of which were located within a half-mile of a gas station. *See id.* ¶ 142. The results of these tests showed 27% of these wells to be contaminated with detectable levels of MTBE; 10% had detectable levels of MTBE exceeding the advisory level set by the EPA; and 3% had detectable levels of MTBE exceeding New York's safe drinking water standard. *See id.* According to the plaintiffs, government officials have verified MTBE contamination of hundreds of private wells and the State has records of approximately 1000 sites where tests of water samples show levels of MTBE in excess of New York's safe drinking water standard. *See id.* ¶ 81.

## III. THE MDL ACTIONS

The MDL actions currently before this Court are: *Berisha and O'Brien v. Amerada Hess Corp., et al.,* No. 00 Civ. 1898 (*"Berisha"*); *La Susa v. Amerada Hess Corp., et al.,* No. 00 Civ. 1898 (*"La Susa"*); *England v. Atlantic Richfield Co., et al.,* No. 00 Civ. 7729 (*"England"*); *Young v. Exxon Mobil Corp., et al.,* No. 01 Civ. 704 (*"Young"*); and *Berrian v. Amerada Hess Corp., et al.,* No. 01 Civ. 1076 (*"Berrian"*).[9] Each action is briefly discussed below.

### A. Berisha

Donna Berisha and Robert O'Brien originally filed a Class Action Complaint against the defendants in the Supreme Court of the State of New York, County of New York. On March 10, 2000, Texaco removed the action to this Court pursuant to 28 U.S.C. §§ 1331 and 1334. Subsequent to the status conference held on January 3, 2001, Berisha and O'Brien severed their individual claims from the putative class action and filed and served a Second Amended Complaint ("Berisha 2d Am. Compl.") on behalf of themselves as individuals, seeking both damages and injunctive relief.[10] The defendants currently

---

**9.** A transfer of a case pursuant to 28 U.S.C. § 1407 cannot be made unless the transferee court has subject matter jurisdiction. *See BancOhio Corp. v. Fox,* 516 F.2d 29, 32 (6th Cir.1975). This Court has jurisdiction over these actions pursuant to either 28 U.S.C.

§§ 1331, 1334 or 1367, or all of them. The *Young* plaintiff has also pled jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

**10.** Accordingly, *Berisha* is not a putative class action.

named in the *Berisha* action include Arco, BP Corp., Citgo, Chevron, Exxon–Mobil, Shell, Shell Oil, Texaco Refining, Texaco, Amerada Hess, El Paso, Motiva, Sunoco, Valero, Tosco, United Refining and Does 1–100.[11]

Both Berisha and O'Brien are residents of New York and owners of property containing private water wells.[12] *See* Berisha 2d Am. Compl. ¶¶ 4.1.a., 4.1.b. In June 1999, tests of water samples taken from Berisha's well showed her well to be contaminated with MTBE at a concentration of 9.4 parts per billion ("ppb"). *See id.* ¶ 4.1.a. In April 1997, tests done on O'Brien's well indicated that his well was contaminated at a concentration of 75 ppb. *See id.* ¶ 4.1.b. As a result of this contamination, Berisha and O'Brien allege that their properties have been devalued. *See id.* ¶¶ 4.1.a., 4.1.b. They further assert that the MTBE contamination was caused by defendants' conduct. *See id.*

### B. *La Susa*

Due to the severance of Berisha and O'Brien's claims, Ron La Susa became the sole representative plaintiff for the putative class in the original New York action. Plaintiffs filed a Second Amended Class Action Complaint ("La Susa 2d Am. Compl.") reflecting this change. The defendants currently named in the *La Susa* action include Arco, BP Corp., Citgo, Chevron, Exxon–Mobil, Shell, Shell Oil, Texaco Refining, Texaco, Amerada Hess,

El Paso, Motiva. Sunoco, Valero, Tosco, United Refining and Does 1–100.

La Susa is a resident of Wappingers Falls, New York. *See* La Susa 2d Am. Compl. ¶ 4.1. Unlike Berisha or O'Brien, La Susa's well has not been tested for the presence of MTBE. *See id.* La Susa alleges that defendants' conduct has placed his well at risk for contamination. He seeks to represent a class of well owners in New York whose properties, while allegedly at risk for contamination, have not yet been tested for MTBE—the "non-test" plaintiffs.

### C. *England*

On October 10, 2000, the Judicial Panel on Multi–District Litigation ("J.P.M.L.") issued an order pursuant to 28 U.S.C. § 1407, transferring the *England* action to this Court from the District Court for the Southern District of Illinois. The plaintiffs in this action are: David England and Rhonda Aylward, residents of Illinois who own wells that have tested positive for MTBE;[13] Claudia Christiansen, a resident of California and owner of a contaminated well;[14] and James Bauer and Rheas Susan McMannis, residents of Illinois whose wells, while tested for MTBE, have not been found to be contaminated.[15] *See* England Am. Compl. ¶¶ 4.1–4.4. The defendants currently named in the *England* action include Arco, BP Corp., Amoco, Cit-

---

**11.** Does 1–100 are named in every action except *England*.

**12.** Berisha sold her property on January 28, 2000. *See* Berisha 2d Am. Compl. ¶ 4.1.a.

**13.** A test of water samples taken from England's well on April 6, 2000 showed MTBE contamination at a concentration of 3 ppb. Water samples taken from Aylward's well on August 4, 2000 showed MTBE contamination at a concentration of 20.6 ppb. *See* England

Amended Complaint ("England Am. Compl.") ¶ 4.1.

**14.** Tests done on Christiansen's well since December 1999 show MTBE contamination at concentrations ranging from 45 to 310 ppb. *See* England Am. Compl. ¶ 4.2.

**15.** Two of the original named plaintiffs, Donna Azbill and Marvin Owca, were voluntarily dismissed from this action.

go, Conoco, Chevron, Exxon–Mobil, Equilon, Phillips and Shell.

England, Christiansen and Aylward seek to represent a class of private well owners in the states of California, Connecticut, Delaware, Illinois, Indiana, Kentucky, Maryland, Massachusetts, Missouri, New Hampshire, New Jersey, Pennsylvania, Rhode Island, Texas, Wisconsin and Virginia, whose wells have tested positive for MTBE. Bauer and McMannis seek to represent a class of well owners in these same states whose wells, while tested, have not yet been found to be contaminated with MTBE—the "non-detect" plaintiffs.

### D. *Young*

On January 24, 2001, the J.P.M.L. transferred the *Young* action to this Court from the District Court for the Middle District of Florida. The named plaintiff in this action is Rebecca Young, a resident of Florida and owner of a private well.[16] Young has filed a Third Amended Complaint ("Young 3rd Am. Compl.") in this action and seeks to represent a class of private well owners in Florida. Tests of water samples from Young's well show MTBE contamination at a concentration of 440 ppb. *See* Young 3rd Am. Compl. ¶ 4.1. The defendants currently named in the *Young* action include Arco, BP Corp., Amoco, Citgo, Conoco, Chevron, Exxon–Mobil, Equilon, Shell, Texaco, Texaco Re-

fining, Amerada Hess, Motiva and Does 1–100.

### E. *Berrian*

The *Berrian* action was filed in this Court on March 2, 2001. The named plaintiffs, Colleen and Robert Berrian, Barbara and James Hayes, and Felicia Ritters, are all residents of Hyde Park, New York whose wells have tested positive for MTBE. *See* Berrian Amended Complaint ("Berrian Am. Compl.") ¶ 0.2. The defendants currently named in the *Berrian* action include Arco, BP Corp., Amoco, Citgo, Chevron, Exxon–Mobil, Equilon, Phillips, Shell, Shell Oil; Texaco, Texaco Refining, El Paso, Amerada Hess, Sunoco. Motiva, Tosco, United Refining, Valero and Does 1–100. Plaintiffs in this action seek to represent a class of private well owners in New York whose wells have been found to be contaminated with MTBE.

### IV. LEGAL STANDARD

To properly rule on a Rule 12(b)(6) motion, a court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *See ICOM*, 238 F.3d at 221. "At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face

---

16. Paul Young, Rebecca Young's husband and co-owner of the property in question, was originally a named plaintiff in this action. On October 10, 2000, a First Amended Complaint was filed in the District Court for the Middle District of Florida pursuant to which Rebecca Young was substituted as the plaintiff and class representative. The *Young* defendants argue that this action should be dismissed because Paul Young, an indispensable party, has not been joined. However, Paul Young has submitted an affidavit consenting to this litigation and agreeing to be bound by its results, thereby protecting his interests and ensuring that the defendants will not be subject to multiple and inconsistent obligations. *See Brocklesby Transport v. Eastern States Escort Servs.*, No. 86 Civ. 9270, 1990 WL 115718, at *2 (S.D.N.Y. Aug. 6, 1990) ("One of the purposes of joinder under Rule 19 is to protect the defendant from multiple suits by joining all parties whose claims are necessary for a full adjudication on the merits of a particular claim."). Accordingly, this action can proceed without Paul Young's joinder.

of the pleading that a recovery is very remote and unlikely but that is not the test.'" *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir.2000) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998)). The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims*, 230 F.3d at 20 (quotation marks and citation omitted). Therefore, dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *ICOM Holding*, 238 F.3d at 221 (quoting *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir.1999)).[17]

## V. DISCUSSION

The plaintiffs set forth seven causes of action in the Master Complaint: *Count I*—strict liability for design defect; *Count II*—failure to warn; *Count III*—deceptive business acts and practices in violation of section 349 of New York's General Business Law ("GBL § 349");[18] *Count IV*—public nuisance; *Count V*—negligence; *Count VI*—breach of notification duty under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601 *et seq.*;[19] and *Count VII*—conspiracy to market an unsafe product.

Defendants assert that plaintiffs' state law claims must be dismissed on numerous grounds. Each of these grounds is discussed in turn.[20]

### A. Standing

■ Constitutional standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119

---

**17.** In deciding a Rule 12(b)(6) motion, the Court must limit itself to facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference. *See Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir.2001). Without attaching documents as exhibits to the Master Complaint, plaintiffs have selectively quoted and cited to various documents and government reports. In considering the present motions, this Court may review such documents if they are deemed integral to plaintiffs' claims. *See Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir.2000); *see also Connecticut Indem. Co. v. 21st Century Transport Co., Inc.*, No. 99 Civ. 7735, 2001 WL 868340, at *3 (E.D.N.Y. July 27, 2001). In addition, the *Young* defendants have requested this Court take judicial notice of facts contained in various public records. For this Court to take judicial notice of such information, the facts must not be subject to reasonable dispute in that they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(2). As such, the Court will only take notice of those facts deemed to meet this requirement.

**18.** This cause of action has been adopted by the *La Susa*, *Berisha*, and *Berrian* plaintiffs.

**19.** This federal cause of action has been adopted by the *England*, *Young*, *Berisha*, and *Berrian* plaintiffs. The defendants are not now moving to dismiss this cause of action.

**20.** When considering questions of state law the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation. *See In re Temporomandibular Joint (TMJ) Implants Prods. Liability Litig.*, 97 F.3d 1050, 1055 (8th Cir.1996); *see also In re Air Crash Disaster Near Chicago, Ill.*, 644 F.2d 594, 610 (7th Cir.1981) (holding transferee court must apply the "choice-of-law rules of the states where the actions were originally filed"). Thus, for purposes of these motions, this Court must apply the law of the state where the wells of the named plaintiffs are located, *i.e.*, New York law for *Berisha*, *Berrian*, and *La Susa*; Illinois and California law for *England*; and Florida law for *Young*.

L.Ed.2d 351 (1992), the Supreme Court defined the three constitutional requirements that plaintiffs must satisfy in order to establish standing. *First,* the plaintiffs must have suffered an injury-in-fact—an injury that is "concrete and particularized" and is "actual or imminent, not conjectural or hypothetical." *Id.* at 560, 112 S.Ct. 2130 (quotation marks and citations omitted). *Second,* the injury must be fairly traceable to the challenged action. *See id. Third,* it must be likely, not just possible, that the injury will be redressed by a favorable ruling of the court. *See id.* at 561, 112 S.Ct. 2130. These three requirements all share a common goal—to ensure that the judiciary, and not another branch of government, is the appropriate forum in which to address a plaintiff's complaint. *See Allen v. Wright,* 468 U.S. 737, 751–52, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Although the plaintiffs bear the burden of establishing these elements, *see Lujan,* 504 U.S. at 560, 112 S.Ct. 2130, the determination of whether Article III standing exists must comport with the "manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. Thus, when standing is challenged on the basis of the pleadings, a court is required to " 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' " *United States v. Vazquez,* 145 F.3d 74, 81 (2d Cir.1998) (quoting *Warth,* 422 U.S. at 501, 95 S.Ct. 2197).

Defendants argue that La Susa, Bauer and McMannis—the "non-test" and "non-detect" plaintiffs—have not alleged a suffi-

cient injury-in-fact to acquire Article III standing. Because La Susa, Bauer and McMannis have not alleged that their wells are contaminated with MTBE, to determine whether these plaintiffs have pled an injury-in-fact, the question this Court must answer is: are plaintiffs' allegations sufficient to show that La Susa, Bauer and McMannis are faced with a present threat of *imminent* harm? Defendants argue that this question must be answered in the negative, and accordingly, the Court must dismiss the claims of these plaintiffs for lack of standing.[21]

### 1. Imminent Harm

■ While imminence, by its very definition, is "somewhat of an elastic concept,"[22] it is bound by the purpose of Article III: to ensure that the "alleged injury is not too speculative." *Lujan,* 504 U.S. at 564 n. 2, 112 S.Ct. 2130; *see also Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 122 (3d Cir.1997) ("The imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms."); *Animal Legal Defense Fund, Inc. v. Espy,* 23 F.3d 496, 500 (D.C.Cir.1994) ("[T]he central question is the immediacy [of injury] ... for the underlying purpose of the imminence requirement is to ensure that the court in which suit is brought does not render an advisory opinion in a case in which no injury would have occurred at all.") (quotation marks and citation omitted). As such, mere "[a]llegations of possible future injury do not satisfy the requirements of

**21.** The fact that these plaintiffs seek to represent a class does not affect the standing inquiry because class representatives must show that they themselves personally have been injured, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth,* 422 U.S. at 502, 95 S.Ct. 2197.

**22.** The term "imminent" is defined as "ready to take place" or "near at hand". Webster's Third New International Dictionary 1130 (1963).

Art[icle] III." *Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). However, an allegation of a threatened injury that is "certainly impending" is sufficient to establish an injury-in-fact, and does meet the necessary constitutional threshold. *See id.; see also Comsat Corp. v. Federal Communications Comm'n,* 250 F.3d 931, 936 (5th Cir.2001) ("A threatened injury satisfies the injury in fact requirement so long as that threat is real, rather than speculative."). Because distinguishing between a threatened injury satisfying the injury-in-fact requirement and a "speculative" or "hypothetical" injury is a matter of degree, each case must be considered on an individual basis. *See Alliance of American Insurers v. Cuomo,* 854 F.2d 591, 595–96 (2d Cir.1988). A review of plaintiffs' allegations reveals that La Susa, Bauer, and McMannis have not alleged a present threat of imminent harm.

### 2. Bauer and McMannis—The "Non–Detect" Plaintiffs

 Both Bauer and McMannis are residents of Madison, Illinois who own private wells. *See* England Am. Compl. ¶ 4.4. To establish a present threat of imminent harm, Bauer and McMannis rely on general allegations concerning the chemical characteristics of MTBE and the widespread MTBE contamination of groundwater throughout the country. Plaintiffs allege that the defendants are continually adding MTBE to gasoline and "today, most if not all gasoline pumped in the RFG areas of the Affected States is laced with high concentrations (11 to 15%) of MTBE." MC ¶ 135. They further allege that each year more than nine million gallons of gasoline escape during transportation, storage, sale or use in the United States, and thousands more gallons enter the soil from consumer overfills of automobile gas tanks and jobber overfills. *See id.* ¶¶ 56, 58. Plaintiffs also allege that

MTBE reaches the ground through rainfall. *See id.* ¶ 60. MTBE has enhanced solubility in water and chemical attraction to water molecules, and thus whenever gasoline with MTBE is released into the environment, "MTBE races to underground water reservoirs, spreading faster and farther than other chemical components contained in gasoline [and] contaminating wells that draw from affected underground aquifers." *Id.* ¶ 49. MTBE can also persist in underground aquifers for many decades. *See id.* ¶ 50. In addition, the USGS has reported that MTBE is the second most frequently detected chemical in groundwater in the United States, *see id.* ¶ 139, and the report of the EPA Blue Ribbon Panel states that MTBE is a "threat to the nation's drinking water resources", has "caused widespread and serious contamination" of the nation's groundwater, and has been found in 21% of ambient groundwater tested in non-attainment areas where MTBE is used. *See id.* ¶ 145.

Notwithstanding the somewhat alarming nature of these general allegations, they are insufficient to demonstrate a "clearly impending" harm directed towards Bauer and McMannis. A court must distinguish between a threat that "'may' pose an imminent endangerment and a threat that is 'certainly impending.'" *Citizens for a Better Env't v. Caterpillar, Inc.,* 30 F.Supp.2d 1053, 1064 (C.D.Ill.1998). Tests done on water samples taken from Bauer and McMannis' wells have shown *no* MTBE contamination, and there are no allegations of any known releases of gasoline containing MTBE occurring near their residences. Further, the allegations do not contain any statistics pertaining to MTBE detection rates for private wells in Madison County or Illinois in general. In addition, Madison County is not a designated area partic-

ipant in the RFG Program,[23] and ethanol, not MTBE, is the primary oxygenate used in the Midwest.[24] Because a "federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing," see *Whitmore,* 495 U.S. at 155, 110 S.Ct. 1717, Bauer and McMannis's claims must be dismissed.

### 3. La Susa—The "Non–Test" Plaintiff

La Susa is an owner of a private well located in the town of Wappingers Falls, Dutchess County, New York. *See* La Susa 2d Am. Compl. ¶ 4.1. Wappingers Falls is an "opt-in" participant in the RFG Program. In addition to the general allegations outlined above, La Susa attempts to rely on New York specific allegations to establish a present threat of imminent harm. La Susa alleges that MTBE accounts for nearly 95% of the oxygenates used in New York, and MTBE consumption statewide is between 17,500 to 21,500 barrels per day. *See* MC ¶ 136. La Susa further alleges that MTBE has been found in drinking water at levels near or above New York's drinking water standard in twenty-four towns throughout the State. *See id.* ¶ 140.[25] The allegations also cite to random statistical studies concerning MTBE detection rates for private wells in New York. For example, in 1997, the USGS found MTBE in 125 of 1100 private wells tested in New York, approximately

11.4%; however, only three of the contaminated wells had concentrations in excess of New York's safe drinking water standard. *See id.* ¶ 141. In July 1999, the New York State Department of Health tested water from 111 private wells, most of which were located within a half-mile of a gas station.[26] *See id.* ¶ 142. While the results of these tests showed 27% of these wells to be contaminated with detectable levels of MTBE, only 10% had detectable levels of MTBE exceeding the advisory level set by the EPA, and 3% had detectable levels of MTBE exceeding New York's safe drinking water standard. *See id.* In addition, according to the plaintiffs, the USGS has detected MTBE in over 20% of aquifers tested in places, like New York, where high MTBE content gasoline is used,[27] *see id.* ¶ 141, and New York officials have verified MTBE contamination of hundreds of private wells. *See id.* ¶ 81. The State also has records of approximately 1000 sites where tests of water samples show levels of MTBE in excess of New York's safe drinking water standard. *See id.*

Although the above allegations indicate that there is some chance that La Susa's well may be, or may become, contaminated in the future, "[f]ederal jurisdiction cannot lie if the alleged injury is merely 'an ingenious academic exercise in the conceivable.'" *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149,

23. Although Illinois is an RFG state, certain geographic areas, including Madison County, are not required to use reformulated gasoline. *See* 7/13/01 Transcript of Oral Argument ("Tr.") 58–59, 72–74.

24. *See* Methyl Tertiary Butyl Ether (MTBE); Advance Notice of Intent to Initiate Rulemaking Under the Toxic Substances Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline ("ANPR"), 65 Fed. Reg. 16094, 16104 (March 24, 2000) (cited to in the Master Complaint), attached as Ex. C to Declaration of Morris A. Ratner in Support

of Plaintiffs' Response and Opposition to Defendants' Motions to Dismiss.

25. Wappingers Falls is not on this list.

26. La Susa has not alleged that he resides near a gas station or other similar facility.

27. Plaintiffs' phrasing of this allegation is somewhat misleading. The allegation states that the USGS has found MTBE contamination in 20% of aquifers tested "in places *like* New York," not *in* New York. MC ¶ 141.

156 (4th Cir.2000) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)). The standard that must be applied is "certainly impending", and even accepting all of the above allegations as true, they are insufficient to meet this requirement.

The line of environmental contamination cases relied upon by the plaintiffs do not support a contrary result. Unlike La Susa, the plaintiffs in the environmental contamination cases were either proximately located to, or had a direct connection to, an alleged area of contamination on or near an identified release site.[28] La Susa has not alleged that his well is proximately located to an identified release of gasoline containing MTBE. Instead, he essentially asks this Court, based on the allegations summarized above, to find that every well owner in New York is under a present threat of imminent harm.[29] To do so, however, would violate the case and controversy requirement and defeat the purpose of Article III—to ensure that the federal courts adjudicate only those disputes which are appropriately resolved through the judicial process.[30] *See Allen*, 468 U.S. at 752, 104 S.Ct. 3315.

For the reasons stated above, the claims of La Susa, Bauer and McMannis are dis-

---

**28.** *See Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1149–51 (9th Cir.2000) (member of plaintiff organization alleged continued recreational use of a creek contaminated by nearby saw mills); *Gaston Copper*, 204 F.3d at 156–157 (member of plaintiff organization lived downstream from chemical discharge); *Friends of Earth v. United States Navy*, 841 F.2d 927, 931–32 (9th Cir.1988) (members of plaintiff organization "live in and around" the Navy's proposed construction of home port facility); *Friends of Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 61 (2d Cir.1985) (a member of plaintiff organization regularly passes the polluted river and finds the pollution in the river offensive to his aesthetic values and another member's children swim and fish in the river); *Peters v. Amoco Oil Co.*, 57 F.Supp.2d 1268, 1277–78 (M.D.Ala.1999) (plaintiffs sought soil testing on "any property boundary of a site which borders on a [named Plaintiff's] property, where the border is located within 250 feet of the site of the leaking UST system, or the known area of contamination."); *In re Tutu Wells Contamination Litig.*, 909 F.Supp. 991, 996 (D.Vi.1995) (involving an identified aquifer that tested positive for gasoline); *Village of Wilsonville v. SCA Serv., Inc.*, 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824, 837 (1981) (dealing with a chemical waste landfill that substantially threatened "the air, water, or ground around the site."); *Kolstad v. Rankin*, 179 Ill.App.3d 1022, 128 Ill.Dec. 768, 534 N.E.2d 1373, 1374–76 (1989) (plaintiffs owned property adjacent to firing range).

**29.** Plaintiffs direct the Court's attention to *Millett v. Atlantic Richfield Co.*, No. Civ. A. CV–98–555, 2000 WL 359979 (Me.Super. Mar. 2, 2000). In *Millett*, the court determined that the plaintiffs, untested well owners living in Maine, had standing, stating that the threat of MTBE contamination was "not abstract or conjectural as the record ... reveals that approximately 15.8% of Maine's wells are contaminated with MTBE." *Id.* at *4 n.2. Assuming, *arguendo*, that this holding is correct, here, plaintiffs do not allege that 15.8% of private wells in New York are contaminated with MTBE. The only random test (not including the July 1999 study which tested wells primarily located within a half-mile radius of a gas station)—the 1997 study by the USGS—found contamination in 11.4% of the wells tested, only three of which had MTBE concentrations in excess of New York's safe drinking water standard. This statistic does not indicate a "certainly impending" harm.

**30.** Plaintiffs also suggest that the present actions are analogous to cases involving claims for "medical monitoring." However, in the "medical monitoring" cases, the plaintiffs were actually exposed to a toxic substance, or are located near an identified release site. *See, e.g., O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D.Cal.1998) (claims limited to those individuals residing or working in a defined "contamination area"). Here, however, the "non-detect" and "non-test" plaintiffs have not alleged *actual* exposure to MTBE nor have they identified MTBE release sites near their properties.

missed for lack of standing.[31]

## B. Preemption

■ The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.; *see also Gibbons v. Ogden*, 22 U.S. 1, 211, 9 Wheat. 1, 6 L.Ed. 23 (1824); *McCulloch v. Maryland*, 17 U.S. 316, 4 Wheat. 316, 427, 4 L.Ed. 579 (1819). Although seemingly a "relatively clear and simple mandate", determining whether Congress has preempted state action in a particular area often leads to considerable debate. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, ——, 121 S.Ct. 2404, 2414, 150 L.Ed.2d 532 (2001). Federal law may displace state law where: (1) Congress expressly preempts state law—express preemption; (2) Congress has established a comprehensive regulatory scheme in the area effectively removing the entire field

from the state realm—implied or field preemption; or (3) where it is impossible for a private party to comply with both state and federal requirements or the state law is an obstacle to the achievement of federal objectives—conflict preemption.[32] *See English v. General Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *see also Leipart v. Guardian Indus., Inc.*, 234 F.3d 1063, 1066 (9th Cir.2000); *Lady v. Neal Glaser Marine, Inc.*, 228 F.3d 598, 601 (5th Cir.2000); *Bedford Affiliates v. Sills*, 156 F.3d 416, 426 (2d Cir.1998).

Defendants assert that plaintiffs' state law claims are both expressly[33] and conflict preempted by the pervasive scheme of federal clean air laws and regulations. Each of defendants' arguments is addressed in turn.

### 1. Express Preemption

Section 7545(c)(4), states, in relevant part:

31. "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Because La Susa, the only named plaintiff, had no standing at the time the action was commenced and no class has been certified, the entire *La Susa* action must be dismissed. *See Walters v. Edgar*, 163 F.3d 430, 432–33 (7th Cir.1998) (an action can be maintained only if circumstances depriving the named plaintiffs of standing arise *after* the suit has been filed, the suit has been certified as a class action, and at least one of the unnamed class members has standing).

32. Conflict preemption is often characterized as a type of implied preemption. *See Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 884, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). For purposes of this decision, the term "conflict preemption" refers only to situations where it is impossible for a private

party to comply with both state and federal requirements or the state law is an obstacle to the achievement of federal objectives.

33. In their submissions to the Court defendants explicitly disavowed any reliance upon the theory of express preemption. *See* Reply Memorandum in Support of Defendants' Joint Motion to Dismiss the Master Complaint as Adopted by Both the *La Susa* and *England* Plaintiffs in their Amended Complaints ("Joint Reply Mem.") at 1 ("Contrary to what Plaintiffs suggest ... Defendants' preemption analysis ... is not based upon the express preemption provision codified at 42 U.S.C. § 7545(c)(4) ...."), and at 6 n. 4 ("Defendants do not rely upon the express preemption provision, codified at 42 U.S.C. § 7545(c)(4)."). Nonetheless, at oral argument, defendants asserted that plaintiffs' claims *are* expressly preempted by section 7545(c)(4). *See* Tr. at 8–11. Therefore, whether section 7545(c)(4) expressly preempts plaintiffs' claims is addressed in this Opinion.

**612**

[N]o State (or political subdivision thereof) may prescribe or attempt to enforce, for purposes of motor vehicle emission control, any control or prohibition respecting any characteristic or component of a fuel or fuel additive in a motor vehicle or motor vehicle engine.... 

42 U.S.C. § 7545(c)(4)(A).

■ Because plaintiffs' claims involve powers that lie at the heart of the states' traditional police powers—the health and safety of its citizens, see *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Exxon Mobil Corp. v. United States Envtl. Prot. Agency,* 217 F.3d 1246, 1255 (9th Cir.2000),[34] it is assumed that plaintiffs' claims " '[a]re not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress.' " *Lorillard,* 533 U.S. at ——, 121 S.Ct. at 2414 (quoting *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997)); *see also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). To determine whether plaintiffs' claims fall within the scope of this provision, the Court must look to the "[c]ongressional purpose", which is the " 'ultimate touchstone' of our inquiry." *Lorillard,* 533 U.S. at ——, 121 S.Ct. at 2414 (quoting *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608). In addition, the scope of the preemption provision must "give effect to a reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Lorillard,* 533 U.S. at ——, 121 S.Ct. at 2441 (Stevens, J., concurring in

part, concurring in the judgment in part, and dissenting in part).

A review of the text of the CAA's preemption provision, as well as the CAA's purpose and legislative history, does not support defendants' position. The purpose of the CAA is to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). The RFG Program was enacted to further this purpose. *See Oxygenated Fuels Assoc. v. Pataki,* 2001 WL 958793, at *1, 158 F.Supp.2d 248 (N.D.N.Y.2001); *see also American Petroleum Inst. v. United States Envtl. Prot. Agency,* 52 F.3d 1113, 1119 (D.C.Cir.1995) (finding that "[t]he sole purpose of the RFG Program is to reduce air pollution"). The text of the CAA's preemption provision specifically limits its reach, stating that no State "may prescribe or enforce, *for purposes of motor vehicle emission control,* any control or prohibition respecting any characteristic or component of a fuel or fuel additive...." 42 U.S.C. § 7545(c)(4) (emphasis added). This limitation is consistent with the purpose of the CAA and RFG Program. Here, plaintiffs' claims are *not* brought for purposes of regulating motor vehicle emissions control, they concern groundwater contamination caused by spills and leakage of gasoline containing MTBE, and are therefore outside the scope of the preemption provision. *See Oxygenated Fuels,* 2001 WL 958793, at *3–4, 158 F.Supp.2d 248.

Further, while members of Congress may have anticipated that MTBE would be used to meet the oxygenate requirements, as correctly noted by the court in *Oxygen-*

---

34. In *Exxon Mobil,* the Ninth Circuit stated that "[a]ir pollution prevention falls under the broad police powers of the states, which include the power to protect the health of citizens in the state. Environmental regulation traditionally has been a matter of state authority." *Exxon Mobil,* 217 F.3d at 1255.

*ated Fuels*, the legislative history of the 1990 CAA amendments indicates that Congress, through the RFG Program, sought to reduce harmful vehicle emissions in the "larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations." *Id.* 2001 WL 958793 at*5, 158 F.Supp.2d 248. Indeed, Congress expected that oxygenates would compete in the marketplace and "preventing a state from [regulating] an oxygenate which it believes threatens its groundwater appears more likely to defeat rather than advance the goals of Congress and [the] EPA...." *Id.* 2001 WL 958793, at *6 n.4, 158 F.Supp.2d 248.[35]

In arguing that plaintiffs' claims fall within the scope of the preemption provision, defendants rely on the Supreme Court's decision in *Lorillard, supra.* There, the Court held that a Massachusetts regulation prohibiting advertising of cigarettes within 1000 feet of a public playground or school either outdoors or at a point of sale below five feet from the floor of a retail establishment was preempted by the express preemption provision of the Federal Cigarette Labeling and Advertising Act ("FCLAA"), codified at 15 U.S.C. § 1334(b). *See Lorillard,* 533 U.S. at ——, 121 S.Ct. at 2419. Section 1334(b) states that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of ... cigarettes...." The State argued that the regulations were not expressly preempted because they targeted youth exposure and were not "based on smoking and health." After reviewing the legislative history of the FCLAA and determining that the phrase "based on smoking and health" has a broad meaning, the Court rejected the State's argument, finding that "[a]t bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette smoking and health." *Id.* at 2418. In addition, the Court rejected the State's argument that the regulations were not preempted because they sought to regulate the location and not the content of advertisements, finding that the distinction was illusory, as the regulations targeted smoking and were motivated by health concerns. *See id.* at 2418–2420.

Defendants' reliance on *Lorillard* is misplaced. Here, plaintiffs' claims concern the contamination, or threatened contami-

---

**35.** Congress' intent to allow some state causes of action is also evidenced by the CAA's citizen suit savings provision, codified at 42 U.S.C. § 7604(e), which states in relevant part:

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or *common law* to seek enforcement of any emission standard or limitation *or to seek any other relief* (including relief against the Administrator or a State agency).

42 U.S.C. § 7604(e) (emphasis added). While this savings provision clearly permits claims against persons who violate federal air pollution emissions standards, air permits or administrative orders issued by the EPA, or against the EPA Administrator for failing to take required actions, courts have held that this provision preserves some state common law claims as well. *See, e.g., Gutierrez v. Mobil Oil Corp.,* 798 F.Supp. 1280, 1282–85 (W.D.Tex.1992) (finding that the legislative history and the CAA savings provision precluded preemption of plaintiff's tort claims in an action involving a leaking UST); *Ouellette v. Int'l Paper Co.,* 666 F.Supp. 58, 61–62 (D.Vt.1987) (finding that plaintiffs' state law nuisance claim against the operator of a New York pulp and paper mill was not preempted by the CAA); *see also Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 492, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (finding that the savings provision of the Clean Water Act—identical to the CAA's savings provision—"negates the inference that Congress 'left no room' for state causes of action").

nation, of groundwater caused by the use of MTBE. This concern is not "intertwined" with the primary concern of the CAA and the RFG Program—the concern over and protection of our air resources. In addition, the text of the FCLAA's preemption provision uses very broad language. It prohibits state laws from imposing requirements or prohibitions with respect to the advertising or promotion of cigarettes "based on smoking and health." 15 U.S.C. § 1334(b). In contrast, the CAA's preemption provision specifically limits its scope to state requirements that proscribe or enforce any control or prohibition respecting any characteristic or component of a fuel or fuel additive *"for purposes of motor vehicle emission control."* 42 U.S.C. § 7545(c)(4)(A) (emphasis added). Further, plaintiffs' claims are not motivated by air pollution concerns, nor does the legislative history of the CAA indicate that Congress intended section 7545(c) to be interpreted beyond its literal meaning.[36]

As the United States Supreme Court has held,

[t]he principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find pre-emption where Congress has not spoken directly to the issue apply with equal force where Congress has spoken, though ambiguously. In such cases, the question is not whether Congress intended to pre-empt state regulation, but to what extent. We do not, absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language.

**36.** It should be further noted that the FCLAA does not contain a savings provision.

**37.** Defendants also assert that the EPA was aware of the groundwater issues associated with MTBE, and pursuant to its duties under the CAA, engaged in a statutorily prescribed

*Cipollone,* 505 U.S. at 533, 112 S.Ct. 2608 (Blackmun, J., concurring in part, concurring in judgment in part, and dissenting in part) (emphasis deleted). Reading section 7545(c)(4) to preempt state law claims concerning the contamination of groundwater caused by the use of MTBE would be contrary to the well established precedent requiring courts to construe preemption provisions narrowly. *See Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240. Accordingly, plaintiffs' claims are not expressly preempted. *See Oxygenated Fuels,* 2001 WL 958793, at *4, 158 F.Supp.2d 248 (holding that section 7545(c)(4) "does not expressly preempt state action taken for the purpose of protecting the [S]tate's groundwater supply from contamination by MTBE").

### 2. Conflict Preemption

■ In order to find plaintiffs' claims conflict preempted, this Court must determine either that (1) it would be impossible for the defendants to comply with both the state law sought to be imposed and the federal requirements; or (2) the state law sought to be imposed would provide an obstacle to the achievement and execution of the full purposes and objectives of Congress. *See English,* 496 U.S. at 79, 110 S.Ct. 2270. Defendants assert that finding them liable for using MTBE, one of a limited number of "federally approved" oxygenates, would present an obstacle to the achievement of the federal objectives of the CAA and the RFG Program and therefore, pursuant to the Supreme Court's decision in *Geier, supra,* plaintiffs' claims are preempted.[37]

cost/benefit analysis prior to certifying gasoline with MTBE for use in the RFG Program. Therefore, defendants argue, the Court is precluded from finding gasoline with MTBE to be a defective product. This argument is addressed in Part V.E.1, *infra.*

In *Geier*, the Court found petitioner's state law tort claims against a car manufacturer for failing to equip an automobile with a driver's side airbag to be conflict preempted by a federal regulation, which at the time of the automobile's manufacture in 1987, required that only 10% of a manufacturer's nationwide fleet be equipped with any passive restraint at all. In reaching its decision, the Court noted that the

> [federal] standard deliberately provided the manufacturer with a range of choices among different restraint devices. Those choices would bring about a mix of different devices introduced gradually over time; and FMVSS 208 [the standard at issue] would thereby lower costs, overcome technical safety problems, encourage technological development, and win widespread consumer acceptance—*all of which would promote FMVSS 208's safety objectives.*

*Geier*, 529 U.S. at 875, 120 S.Ct. 1913 (emphasis added). The Court then determined that petitioner's tort claims "would have presented an obstacle to the variety and mix of devices that the federal regulation *sought* ... [and] also would have stood as an obstacle to the gradual passive restraint phase-in that the federal regulation *deliberately imposed.*" *Id.* at 881, 120 S.Ct. 1913 (emphasis added). Thus, because the rule of law petitioner sought to impose "would have stood as an obstacle to the accomplishment and execution of the[se] important means-related federal objectives", the Court found petitioner's

claims to be preempted. *Id.* (quotation marks and citation omitted).

*Geier* is distinguishable from the actions before this Court. The RFG Program was enacted to further the CAA's purpose of protecting and enhancing the quality of air resources. *See Oxygenated Fuels*, 2001 WL 958793, at *1, 158 F.Supp.2d 248. In an effort to further this objective, the RFG Program set a *minimum standard* for oxygen content for gasoline to be used in certain designated non-attainment areas. While the EPA has certified various blends of gasoline for use in the RFG Program, including gasoline with MTBE,[38] unlike the federal regulation at issue in *Geier*, the RFG Program does not *deliberately* seek to employ various "means-related" objectives, such as maintaining a mix of oxygenates or creating a gradual phase-in plan for the use of oxygenates in order to further its goal of reducing air pollution. In addition, unlike the rule sought to be imposed in *Geier*—establishing a duty to install airbags—plaintiffs do not seek to require the use of a specific oxygenate. The RFG Program does not mandate the use of MTBE, nor was it "intended to maintain the status quo or to protect certain fuel additives." *Oxygenated Fuels*, 2001 WL 958793, at *20, 158 F.Supp.2d 248; *see also Exxon Mobil*, 217 F.3d at 1253 ("The legislative history [of the 1990 CAA amendments] suggests that fuel neutrality on the part of the [EPA] Administrator was a goal of the provisions...").

Defendants argue that at this time there are no "practicable" alternatives to MTBE sufficient to satisfy the oxygenate require-

---

**38.** Under the RFG Program, certification has a narrow meaning. Section 7545(k)(4)(B) states that the "Administrator shall certify a fuel formulation ... as complying with this subsection" if it satisfies the conditions set forth in section 7545(k)(2) and (3), both of which concern *only* the effectiveness of the formulation in reducing air pollution and do not consider non air-quality concerns. *See* 42 U.S.C. § 7454(k)(2) and (3). In addition, while MTBE has been registered for use by the EPA pursuant to section 7545(a) and (b), such registration does not constitute an "endorsement, certification or approval by any agency of the United States." 40 C.F.R. § 79.11(h).

ments of the RFG Program, plaintiffs have not alleged there are any such "practicable" alternatives, and therefore plaintiffs' proffered rule—*i.e.*, that defendants are liable for using MTBE and are therefore obligated to use another oxygenate—would seriously undermine the objectives of the CAA and the RFG Program. However, plaintiffs allege that

> [s]afer alternatives to MTBE exist and have been available to Defendants at all times relevant to this litigation, for the purposes of increasing both the octane level and oxygen content of gasoline. Such sensible alternatives to MTBE include, but are not limited to ethanol and other "oxygenates" and "octane enhancers."

MC ¶ 191; *see also id.* ¶ 122 ("Safer, more environmentally sound alternatives were available."). Whether such alternatives are "practicable" and have been available to the defendants for their use in the RFG Program is a question of fact that the Court cannot address on a motion to dismiss.

For the reasons stated above, defendants' motions to dismiss based on the grounds that plaintiffs' claims are preempted are denied.

### C. Primary Jurisdiction

Defendants assert that plaintiffs' claims raise a host of complex technical and policy issues that are within the expertise and discretion of various environmental agencies and that environmental regulators at all levels of governments are currently working to address these issues. Defendants also assert that each of the relevant jurisdictions have programs that will provide plaintiffs with the essential relief they seek—MTBE testing and where appropriate, the provision of clean water and/or remediation. They further assert that the Court-ordered relief plaintiffs seek would threaten the hope of obtaining a uniform and consistent response to the problem of MTBE groundwater contamination. Accordingly, they urge this Court to dismiss or abstain based upon the primary jurisdiction doctrine.

### 1. Standard

 The doctrine of primary jurisdiction allows a federal court, in the exercise of its discretion, to stay an action and refer a matter extending beyond the "conventional experiences of judges" or "falling within the realm of administrative discretion" to an administrative agency with more specialized experience, expertise, and insight. *Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Courts generally apply the doctrine "whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); *see also Johnson v. Nyack Hosp.,* 964 F.2d 116, 122–23 (2d Cir.1992); *Flo–Sun, Inc. v. Kirk,* 783 So.2d 1029, 1036–37 (Fla.2001). Although originally applied in situations involving jurisdictional conflicts between federal courts and federal agencies, in recent years the doctrine has been held applicable where state agencies have jurisdiction over issues sought to be raised before federal district courts. *See Martin v. Shell Oil Co.,* 198 F.R.D. 580, 585 (D.Conn. 2000). In deciding whether to apply the primary jurisdiction doctrine a court should take into account the doctrine's two primary interests: resolving technical questions of fact through an agency's specialized expertise prior to judicial consideration of the legal claims; and consistency and uniformity in the regulation of an area which Congress has entrusted to a specific

agency. *See Golden Hill Paugusset Tribe of Indians v. Weicker,* 39 F.3d 51, 59 (2d Cir.1994).

■ There is, however, no fixed formula to be applied in deciding whether to defer to an agency based on primary jurisdiction. Courts generally look to the following factors in making this determination:

(1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;

(2) whether the question at issue is particularly within the agency's discretion;

(3) whether there exists a substantial danger of inconsistent rulings; and

(4) whether a prior application to the agency has been made.

*Martin,* 198 F.R.D. at 585 (citing *National Communications Assoc. v. American Tel. and Tel. Co.,* 46 F.3d 220, 222–23 (2d Cir. 1995)). In addition, courts should "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *National Communications,* 46 F.3d at 223.

## 2. Analysis

■ Both the first and second factors counsel against the invocation of the primary jurisdiction doctrine. "Referral of an issue to an agency on the grounds of primary jurisdiction is inappropriate when the issue in question is a purely legal one ... or turns on a factual matter requiring no technical or policy expertise." *Bernhardt v. Pfizer, Inc.,* Nos. 00 Civ. 4042, 00 Civ. 4379, 2000 WL 1738645, at *2 (S.D.N.Y. Nov. 22, 2000) (citation omitted). The resolution of the questions presented by plaintiffs' common law claims does not require the specialized technical or policy expertise of any governmental agency. Plaintiffs' claims, for the most part, are grounded in state tort law. Although the issues raised by these claims may require some technical analysis, questions such as whether gasoline with MTBE is a defective product, whether the defendants breached any duties owed to the plaintiffs by marketing gasoline with MTBE or by failing to give adequate warnings, whether defendant conspired to mislead the public regarding the hazards of MTBE, and whether plaintiffs' injuries were caused by defendants' conduct, are legal questions that fall within the conventional experience of judges, not administrative agencies. *See Martin,* 198 F.R.D. at 585–86.[39]

**39.** In *Martin,* plaintiffs, property owners, alleged that MTBE found in their wells was attributable to a leaking service station located nearby. Plaintiffs brought trespass, nuisance and negligence claims against the service station owners, and sought money damages, as well as an order enjoining the defendants from allowing any further migration of hazardous substances onto plaintiffs' properties and requiring defendants to connect plaintiffs to a potable water supply. Defendants sought to dismiss plaintiffs' claims on the grounds that the Connecticut Department of Environmental Protection ("CTDEP") had jurisdiction over the matter.

In denying defendants' motion, the court stated:

Although the resolution of the issues in this case undoubtedly will require some technical analysis, the claims—for example, whether Shell breached a duty to the plaintiffs, whether Shell trespassed or created a nuisance on the plaintiffs' property, whether Shell defrauded the plaintiffs, or whether Shell was willful, wanton or reckless in its actions toward the plaintiffs—are all of a type commonly adjudicated by the courts. They do not require extensive interpretation of agency regulations. Although the CTDEP undoubtedly possesses expertise in the area of environmental pollution, the de-

Further, courts generally invoke the primary jurisdiction doctrine where a specific issue raised is "squarely placed within [the agency's] informed expert discretion" and the agency being deferred to is capable of deciding the issue. *Bernhardt*, 2000 WL 1738645, at *3 (deferring the question of whether a notice of warning to drug users should be issued to the FDA—the agency with the relevant expertise and power to issue such notices); *see also Golden Hill*, 39 F.3d 51, 59–60 (court deferred the issue of whether plaintiff met the criteria for tribal status to the Bureau of Indian Affairs, the agency which promulgated the regulations governing this issue); *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1349–1350 (D.N.M. 1995) court deferred plaintiff's request for injunctive relief and remediation with respect to a contaminated mine site where the state environmental agency was dealing with the issue and had already issued an order providing appropriate relief. That is not the case here. Although the EPA and various state environmental agencies are investigating the overall problem of MTBE contamination of groundwater and considering policy options in preparation for possible rulemaking or legislative recommendations,[40] none of these agencies are addressing the specific issues raised by plaintiffs' common law claims, nor are these issues squarely within their expertise.

With respect to the third factor, defendants argue that should this Court award plaintiffs the injunctive relief they seek, there is a strong likelihood that such relief will be inconsistent with the relief currently available through state statutory/regulatory programs, as well as any possible future relief provided by either the EPA or a state agency designed to specifically address the problem of MTBE contamination of groundwater. At this time, however, the specific relief sought by plaintiffs is not provided by the various administrative agencies, nor does such relief appear to be forthcoming in the near future. *See National Communications*, 46 F.3d at 223 (in determining whether to apply the primary jurisdiction doctrine a court must balance the advantages of applying the primary jurisdiction doctrine against potential costs resulting from complications and/or delay in the administrative process). Further, courts generally do not defer jurisdiction where plaintiffs seek damages for injuries to their property or person. *See Friends of Santa Fe*, 892 F.Supp. at 1350. In addition to the injunctive relief sought on behalf of the putative classes, compensatory damages are sought for those named plaintiffs who demonstrate an entitlement to such relief. *See* MC at Prayer for Relief ¶ c. Punitive damages are also sought by both the *Berisha* and *Berrian* plaintiffs.[41]

For these reasons, I decline, in the exercise of my discretion, to dismiss or abstain on the basis of primary jurisdiction.

### D. Plaintiffs' Failure to Identify Which Defendant or Defendants Caused Their Injury

 Regardless of the theory upon which liability is predicated, in order to hold a producer, manufacturer, or seller liable for injury caused by a particular

fendant has not persuaded this court that the CTDEP's expertise is essential in adjudicating the matters at hand.
198 F.R.D. at 585–86 (footnote omitted).

**40.** New York and California have recently passed legislation providing for the phase-out

of MTBE—California by December 31, 2002, and New York by January 1, 2004. The EPA is also considering a future ban or limit on MTBE under the TSCA. *See* ANPR.

**41.** The fourth factor is inapplicable and need not be discussed.

product, there must be proof that the defendant being sued is the entity that actually produced, manufactured, sold, or was in some way responsible for the product. *See Sanderson v. International Flavors and Fragrances, Inc.*, 950 F.Supp. 981, 984 (C.D.Ca.1996); *Pulte Home Corp. v. Ply Gem Indus., Inc.*, 804 F.Supp. 1471, 1485 (M.D.Fla.1992); *Healey v. Firestone Tire & Rubber Co.*, 87 N.Y.2d 596, 601–02, 640 N.Y.S.2d 860, 663 N.E.2d 901 (1996); *Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324, 328 (1990). Here, plaintiffs do not allege which defendant caused their injuries. Instead, they allege that such specific identification is impossible, and accordingly, seek to invoke one of the recognized collective theories of liability—market-share liability, alternative liability, concert of action/conspiracy, or enterprise liability—as a basis for imposing liability upon all of the defendants. *See* MC ¶¶ 167–71. Defendants argue that because these theories do not fit the circumstances of the present actions, plaintiffs' state law claims must be dismissed.

### 1. The Collective Liability Theories

The theory of alternative liability originated in a California case, *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (Ca.1948), in which a hunter was injured when shot by one of two companions who each fired in the plaintiff's direction at the same time. This theory may be applied when the conduct of two or more actors toward the plaintiff is tortious, the harm to the plaintiff was caused by only one of them, and there is uncertainty as to which one caused the plaintiff's injury. *See id.* at 2–5; *see also* Restatement (Second) of Torts § 433B(3) (1979). In such a case, the burden of proof as to causation is reversed and placed upon each defendant to prove that it did not cause the harm. *See New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 106–07 (3d Cir.1999).

An allegation of alternative liability requires joining all potentially culpable defendants in the action. *See id.*

Market-share liability was first developed by the California Supreme Court in a case involving an injury caused by the drug diethylstilbestrol (DES), a fungible or generic drug the plaintiff's mother took to help prevent a miscarriage, that could not be traced back to its manufacturer when, years after the product was ingested, the plaintiff manifested an injury. *See Sindell v. Abbott Labs.*, 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (Ca.1980). Under market-share liability, when a plaintiff is unable to identify the specific manufacturer of a fungible product that caused her injury, the plaintiff may recover damages from a manufacturer or manufacturers in proportion to each manufacturer's share of the total market for the product. *See, e.g., Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 509–513, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (1989)(DES); *Sindell*, 163 Cal.Rptr. 132, 607 P.2d at 936–38; *see also Richie v. Bridgestone/Firestone, Inc.*, 22 Cal. App.4th 335, 27 Cal.Rptr.2d 418, 421 (1994) ("Under the market share theory of liability, a plaintiff harmed by a fungible product that cannot be traced to a specific producer may sue various makers of the product if the plaintiff joins a substantial share of those makers as defendants."). Generally, in order to invoke the theory, a plaintiff must be unable to identify any of the specific manufacturers responsible for the harm and defendants representing a substantial share of the market for the product must be joined in the action. *See Sindell*, 163 Cal.Rptr. 132, 607 P.2d at 936–38.

Enterprise liability is a theory used to hold all manufacturers in a specific industry liable when the plaintiff is unable to identify the specific manufacturer whose product caused the harm, and when the

industry jointly controlled the risk. *See Hall v. E.I. DuPont De Nemours & Co.*, 345 F.Supp. 353, 374–78 (E.D.N.Y.1972). This joint control generally involves the use of a trade association or other form of agreement or custom through which industry-wide practices or safety standards are determined. *See id.* at 374.

Finally, under the theory of concert of action, a defendant may be held jointly and severally liable if it commits a tortious act in concert with another or pursuant to a common design, or a defendant gives substantial assistance to another knowing that the other's conduct constitutes a breach of duty. *See Smith*, 148 Ill.Dec. 22, 560 N.E.2d at 329; *see also* Restatement (Second) of Torts § 876.

## 2. Applicable Law

In order to determine whether plaintiffs' allegations are sufficient to support one of the collective theories of liability, this Court must look to the law of the relevant states. Because the issue of whether collective liability should be applied in the context of MTBE contamination has not been squarely addressed by these states, this Court must predict how the highest court of each state would resolve this issue. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994). In doing so, the "fullest weight" should be given to the "pronouncements of the [highest court of the states]." *Id.* In addition, relevant rulings of other state courts, as well as relevant cases from other jurisdictions may be considered. *See New York v. Blank*, 27 F.3d 783, 788 (2d Cir.1994).

### a. New York and California

■ On questions of collective liability in tort, the highest courts of New York and California have been national leaders. As noted above, market-share liability originated with the *Sindell* case. The complaint in *Sindell* named only eleven of the approximately 200 manufacturers of DES and alleged that the plaintiff was unable to identify the manufacturer of the DES ingested by her mother. *Sindell* expressly rejected the alternative liability theory under those circumstances because there was no rational basis to infer that any one of the named defendants was actually responsible for harming the plaintiff nor was there even a "reasonable possibility that they were responsible." *Sindell*, 163 Cal.Rptr. 132, 607 P.2d at 930–31. However, because the plaintiff had joined a substantial percentage of the DES market in her lawsuit, the court allowed plaintiff to proceed on a market-share theory.

In New York, the Court of Appeals first examined market-share liability in the DES context in *Hymowitz, supra.* In doing so, it explained that the doctrine of alternative liability is inapplicable in DES cases, because use of the alternative liability doctrine generally requires that (1) the defendants have better access to information than the plaintiff; (2) that all possible tortfeasors be before the court; and (3) the number of possible wrongdoers is small, ensuring the likelihood that one of the wrongdoers actually injured the plaintiff. *See Hymowitz*, 73 N.Y.2d at 505–506, 541 N.Y.S.2d 941, 539 N.E.2d 1069. The court explained that in DES cases "there is a great number of possible wrongdoers, who entered and left the market at different times, and some of whom no longer exist" and that in view of the passage of time between the manufacture and the alleged injury, "DES defendants are not in any better position than are plaintiffs to identify the manufacturer of the DES ingested in any given case, nor is there any real prospect of having all the possible producers before the court." *Id.* at 506, 541 N.Y.S.2d 941, 539 N.E.2d 1069. The court therefore concluded that in the DES context, a plaintiff unable to name the

manufacturer of the drug ingested by her mother may sue all of the manufacturers of the drug, without proof of proximate causation; however, she will be limited to collecting from each defendant the percentage of her damages that represents that defendant's market-share of the product. *See id.* at 512–513, 541 N.Y.S.2d 941, 539 N.E.2d 1069. Recognizing that it was establishing rules in the context of a mass litigation, the court held that a market-share theory using a national market should be applied in the DES cases because it was impossible for plaintiffs to identify the manufacturer whose product caused the injury. The court emphasized that identification was impossible because of the identical chemical composition of the product, druggists filled prescriptions from whatever products were in stock, a large number of companies marketed the drug and there was a lengthy latency period before the onset of injury.

Outside the DES context, market-share liability has been sparingly adopted. Its application has been largely rejected primarily on the ground that the product in question was not fungible. Recently, in *Hamilton v. Beretta U.S.A. Corp.,* 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001), the New York Court of Appeals rejected the market share theory in an action brought by gunshot victims against firearms manufacturers for negligent marketing. The court stated that DES was unique in that

> (1) the manufacturers acted in a parallel manner to produce an identical, generically marketed product; (2) the manifestations of injury were far removed from the time of ingestion of the product; and (3) the Legislature made a clear policy decision to revive these time-barred DES claims.

*Beretta,* 96 N.Y.2d at 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055. The court stated that "[u]nlike DES, guns are not identical, fungible products." *Id.* The court also distinguished the DES case from the handgun action by stating that unlike DES, "the distribution and sale of every gun is not equally negligent, nor does it involve a defective product." *Id.* at 241, 727 N.Y.S.2d 7, 750 N.E.2d 1055. The court further noted that "[d]efendants engaged in widely-varied conduct creating varied risks[,][t]hus, a manufacturer's share of the national handgun market does not necessarily correspond to the amount of risk created by its alleged tortious conduct." *Id.*

Here, plaintiffs allege that their wells are contaminated with MTBE, identification of the manufacturer or manufacturers who produced the offending product is impossible, and MTBE is a fungible product. *See* MC ¶¶ 152, 167. Plaintiffs further allege that gasoline containing MTBE, once released into the environment, lacks characteristics or "a chemical signature" that would enable identification of the refinery or company that manufactured the product. *Id.* ¶ 148. Even when a source of an MTBE plume (*i.e.,* a leaky UST) is identified, due to defendants' practice of trading, bartering, or otherwise exchanging their product with each other as well at the chemical characteristics of MTBE, the identity of the manufacturer or manufacturers of the offending gasoline cannot be determined. *See id.* ¶¶ 149. MTBE can reach the ground through various avenues, *see id.* ¶¶ 56, 58, 60, and although MTBE comes from gasoline, wells contaminated with MTBE frequently show either little or no traces of other gasoline components. *See id.* ¶ 50. Plaintiffs further allege that the defendants in this action are manufacturers that together control a very substantial share of the market for gasoline containing MTBE in the relevant states. *See id.* ¶ 154.

The traditional theory of alternative liability is not a viable option in these actions.[42] However, plaintiffs' allegations may, after further discovery, support the application of market-share liability under both New York and California law.[43]

#### b. Illinois

Unlike New York and California, the market-share theory has been expressly rejected in Illinois.[44] *See Smith v. Eli Lilly & Co.*, 137 Ill.2d 222, 148 Ill.Dec. 22, 560 N.E.2d 324 (1990); *see also Millar–Mintz v. Abbott Labs.*, 268 Ill.App.3d 566, 206 Ill.Dec. 273, 645 N.E.2d 278, 280 (1994) ("In *Smith*, our supreme court rejected the 'market share liability' theory as viable for tort claims in Illinois."). As such, the Illinois plaintiffs must rely on either concert of action or enterprise liability as a basis for imposing liability upon all of the defendants.

To invoke the theory of enterprise liability, plaintiffs must allege that (1) the injury-causing product was manufactured by one of a small number of defendants in an industry; (2) the defendants had joint knowledge of the risks inherent in the product and possessed a joint capacity to reduce those risks; and (3) each of them failed to take steps to reduce the risk but, rather, delegated this responsibility to a trade association. *See Smith*, 148 Ill.Dec. 22, 560 N.E.2d at 329 (citation omitted). Plaintiffs have not pled sufficient facts establishing these three requirements and therefore may not rely on this theory of liability.

The only remaining collective liability theory available to the Illinois plaintiffs is concert of action. Because concert of action is intertwined with the tort of civil conspiracy and generally requires the same factual allegations, *see McClure v.*

**42.** The facts alleged in the present actions do not satisfy the requirements of *Summers, supra,* or its related authorities. Indeed, they are more in line with the product liability cases that have applied the market-share theory. "[A]lternative liability rests on the notion that where there is a small number of possible wrongdoers, all of whom breached a duty to the plaintiff, the likelihood that any one of them injured the plaintiff is relatively high, so that forcing them to exonerate themselves, or be held liable, is not unfair." *Hymowitz,* 73 N.Y.2d at 506, 541 N.Y.S.2d 941, 539 N.E.2d 1069; *see also Sindell,* 163 Cal. Rptr. 132, 607 P.2d at 931. In order to apply the alternative liability in its classic form, "plaintiff[s] must [allege] that all possible tortfeasors are before the court; that all have breached a duty toward the plaintiff[s]; that the conduct of one of the defendants has caused [their] injuries; and that the defendants, as a group, have better access to information concerning the incident than do[ ] the plaintiff[s]." *New York Tel. Co. v. AAER Sprayed Insulations,* 250 A.D.2d 49, 679 N.Y.S.2d 21, 24 (1st Dep't 1998); *see also Hymowitz,* 73 N.Y.2d at 505–506, 541 N.Y.S.2d 941, 539 N.E.2d 1069; *Summers,* 33 Cal.2d at 86, 199 P.2d 1; Restatement (Second) of Torts § 433B, comment h. The pres-

ent actions involve many defendants, making the likelihood that any one of them caused plaintiffs' injuries relatively low. Further, plaintiffs have not alleged that *all* possible tortfeasors have been joined. *See* MC ¶ 30 (naming Does 1–100 as defendants) and ¶ 154 (defendants "together control a very substantial share of the market for gasoline containing MTBE...."). In addition, plaintiffs' allegations concerning the characteristics of MTBE (*i.e.,* its fungibility and ability to persist underground for extended periods of time), as well as the inherent inability to determine when a spill or leak causing the contamination occurred, demonstrate that the defendants are in no better position than the plaintiffs to identify who manufactured the offending product.

**43.** Defendants argue that because MTBE is handled by third-parties (*i.e.,* downstream handlers) after it is manufactured the defendants lack the requisite "control" over the product to render market-share applicable. The question of control, however, is a fact question that cannot be decided on a motion to dismiss.

**44.** The Illinois plaintiffs conceded this point at oral argument. *See* Tr. at 95.

*Owens Corning Fiberglas Corp.*, 188 Ill.2d 102, 241 Ill.Dec. 787, 720 N.E.2d 242, 261–62 (1999), whether the Illinois plaintiffs can hold defendants liable under this theory is discussed in conjunction with plaintiffs' conspiracy claim at Part V.E.5, *infra.*

### c. Florida

■■■ In *Conley v. Boyle Drug Co.*, 570 So.2d 275 (Fla.1990), a DES case, the Florida Supreme Court adopted a market-share theory of liability. *See id.* at 285. Market-share liability, however, as established by *Conley*, is available only in actions sounding in negligence, and the plaintiff must establish that she has made a genuine attempt to locate and identify the manufacturer responsible for the injury. *See id.; see also Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1487–88 (11th Cir.1994) (finding that *Conley* restricted market-share as a vehicle of recovery only to those actions sounding in negligence). Thus, only plaintiff's claims sounding in negligence may proceed under the market-share theory.[45]

With respect to Young's other claims, the only remaining collective liability theory is concert of action. As with the Illinois plaintiffs, whether Young can invoke this theory is discussed in conjunction with plaintiffs' conspiracy claim at Part V.E.5, *infra.*

### E. The Sufficiency of Plaintiffs' Claims

### 1. Strict Liability for Design Defect and Negligence

■■■ Plaintiffs' causes of action for design defect and negligence are based upon the same design failure—the use of MTBE in gasoline. Defendants argue that gasoline with MTBE cannot be defective as a matter of law and therefore both of these claims must be dismissed.

Courts have generally utilized the "risk-utility balancing" test to determine whether a product is defectively designed.

> A product is defective when, at the time of sale or distribution, it . . . is defective in design. . . . A product . . . is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

Restatement (Third) of Torts: Products Liability § 2(b) (1998); *See Marilyn Merrill v. Navegar, Inc.*, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001) (a product is defectively designed if it has failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or if the benefits of the challenged design do not outweigh the risk of danger inherent in such design); *Lamkin v. Towner*, 138 Ill.2d 510, 150 Ill.Dec. 562, 563 N.E.2d 449, 457 (1990) (same); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983) (adopting risk-utility test for design defect claims).[46]

Defendants argue that any risk-utility analysis would impermissibly permit a re-

---

**45.** Defendants argue that Young has failed to allege a genuine attempt to locate and identify the manufacturer responsible for her injury and this failure precludes Young's use of market-share as a theory of liability. However, at this stage of the proceedings, plaintiff's allegations concerning the impossibility of identifying such manufacturer are sufficient to satisfy the *Conley* requirement.

**46.** Although the Florida Supreme Court has not expressly adopted the risk-utility test for strict liability claims, *see West v. Caterpillar Tractor, Co.*, 336 So.2d 80, 86–87 (Fla.1976) (adopting the consumer expectation test),

examination of the mandatory cost-benefit analysis delegated to and performed by the EPA pursuant to its obligations under the CAA. More specifically, defendants note that Congress, through the RFG Program, authorized the EPA to issue regulations to reduce air pollution while taking into consideration "the cost of achieving such emission reductions, any non air-quality and other air-quality related health and environmental impacts and energy requirements." 42 U.S.C § 7545(k)(1). However, as discussed earlier, Congress did not mandate the use of MTBE, nor did the EPA's certification of gasoline containing MTBE require consideration of non air-quality factors. In addition, while the EPA could consider the non air-quality factors listed above, the "overriding goal is air quality, and the other listed considerations are subordinate to that goal." *American Petroleum*, 52 F.3d at 1120. Indeed,

> [o]nce [the] EPA has taken the factors into consideration in the context of attaining the greatest reduction in VOC's and toxics [sic] emissions achievable, the statute does not authorize [the EPA] to use these factors as a basis for imposing any additional restrictions on RFG, even if the additional restrictions would yield some benefit among the factors to be taken into consideration.

*Id.* Thus, while the EPA could consider the non air-quality impact of the use of MTBE, any such consideration was secondary to the goal of reducing air pollution and not commensurate with a risk-utility analysis.

Plaintiffs allege that defendants knew of the unreasonable dangers associated with gasoline containing MTBE, actively conspired to conceal these dangers, and at all times relevant to this litigation safer alternatives to MTBE were known and available to the defendants for use in gasoline.[47] *See* MC ¶¶ 65–137, 184–194. Plaintiffs further allege that the use of MTBE and defendants' introduction of gasoline containing MTBE into the stream of commerce was a proximate cause of the contamination of their wells. *See id.* ¶ 194. These allegations are sufficient to state a claim for both strict liability for design defect as well as negligence.[48] According-

---

Florida courts have stated in *dicta* that the risk-utility test may be more appropriate for design defect cases. *See, e.g., Barrow v. Bristol–Myers Squibb Co.*, No. 96–689–CIV–ORL–19B, 1998 WL 812318, at *27–28 (M.D. Fla. Oct. 29, 1998); *Pulte*, 804 F.Supp. at 1487; *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1145 (Fla.Dist.Ct.App.1981); *see also Standard Jury Instructions in Civil Cases*, 778 So.2d 264 (Fla.2000) (defining the term "unreasonably dangerous" both in terms of the consumer expectation test and the risk-utility test). It appears likely that the Florida Supreme Court would find the risk-utility test appropriate for analysis of Young's design defect claim.

**47.** Defendants also argue that the alternatives to using MTBE were not viable and therefore the design defect claims must be dismissed. However, the viability of any such alternatives cannot be decided on a motion to dismiss. *See* Part V.B.2, *supra*.

**48.** The *Young* defendants also argue that Young's strict liability claim must be dismissed because the product at issue—gasoline containing MTBE—was substantially altered after it left defendants' control, *see High v. Westinghouse Elec. Corp.*, 610 So.2d 1259, 1262 (Fla.1992) (finding that human dismantling of electronic transformers constituted a substantial alteration and therefore strict liability could not apply), and it was not being used for its intended purpose. *See Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999) (finding that child's use of a lighter as a "plaything" was not the intended use and thus the manufacturer could not be held strictly liable for injuries sustained by the child). However, gasoline with MTBE is not intentionally altered—the release of the product is alleged to occur from foreseeable and expected storage and transport of the product. In addition, in *Jennings*, strict liability was found to be inappropriate because the manufacturer did not intend for the child to

ly, defendants' motions to dismiss these claims are denied.

## 2. Failure to Warn

In Count II of the Master Complaint, plaintiffs have asserted a separate cause of action for failure to warn. Defendants argue that these claims must fail because (1) any duty defendants had to issue warnings runs exclusively to foreseeable users of a product and plaintiffs' injuries are not premised on their own foreseeable use of gasoline containing MTBE; and (2) plaintiffs' theory of proximate cause is impermissibly speculative.

### a. The Defendants' Duty to Warn

■ Whether a cause of action for failure to warn is based in negligence or strict liability, "a manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998); *De-Leon v. Commercial Mfg. & Supply Co.*, 148 Cal.App.3d 336, 195 Cal.Rptr. 867, 871 (1983) ("A duty to warn or disclose danger arises when an article is or should be known to be dangerous for its intended use, either inherently or because of defects."); *Sollami v. Eaton*, 319 Ill.App.3d 612, 254 Ill.Dec. 335, 747 N.E.2d 375, 380–81 (2001) ("A duty to warn exists where there is unequal knowledge, actual or constructive, and the defendant, possessed of such knowledge, knows or should know that harm might or could occur if no warning is given."); *Brown v. Glade and Grove Supply, Inc.*, 647 So.2d 1033, 1035 (Fla. Dist.Ct.App.1994) ("a manufacturer ... who knows or has reason to know that the product is likely to be dangerous in normal use has a duty to warn those who may not

fully appreciate the possibility of such danger.").

In cases brought against manufacturers and suppliers for injuries resulting from the use of hazardous materials or other unreasonably dangerous products, courts have generally held that such manufacturers owe a duty to warn foreseeable users of the latent dangers of the product. *See Hunnings*, 29 F.3d at 1484–85 (duty to warn users of dangers associated with hazardous substance); *Tampa Drug Co. v. Wait*, 103 So.2d 603, 607 (Fla.1958) (duty to warn those who might use an inherently dangerous product of its dangerous potentialities); *Venus v. O'Hara*, 127 Ill.App.3d 19, 82 Ill.Dec. 143, 468 N.E.2d 405, 409–10 (1984) (duty to warn users of dangerous propensities of hazardous substance); *Groll v. Shell Oil Co.*, 148 Cal.App.3d 444, 448, 196 Cal.Rptr. 52 (1983) (duty to warn user of dangerous propensities of the product). Some courts have also held that the duty to warn extends to "third persons exposed to a foreseeable and unreasonable risk of harm by the failure to warn." *McLaughlin v. Mine Safety Appliances Co.*, 11 N.Y.2d 62, 68–69, 226 N.Y.S.2d 407, 181 N.E.2d 430 (1962).

■ While plaintiffs in the present actions do not allege that the contamination of their wells was the direct result of their own use of gasoline containing MTBE, the allegations are sufficient to show that the harm suffered by the plaintiffs was a foreseeable result of defendants' placement of gasoline containing MTBE in the marketplace. Plaintiffs allege that defendants intentionally created a market where everybody, including plaintiffs, would be foreseeable users of gasoline containing MTBE. Defendants

handle or treat the lighter like a toy. Here, Young alleges that the defendants intended that gasoline containing MTBE be handled in

a manner they knew could result in injury to the plaintiff. These allegations are sufficient to plead a claim sounding in strict liability.

knew of MTBE's dangerous characteristics, conspired to suppress this information, and were aware that adding MTBE to gasoline for commercial use could lead to the widespread contamination of groundwater and private wells. *See* MC ¶¶ 65–137, 184–194. "Gasoline is used and stored by nearly every adult person in the United States", *id.* ¶ 59, and despite defendants' awareness of the threat gasoline containing MTBE poses to groundwater, defendants have made MTBE the oil industry's "oxygenate of choice." *See id.* ¶¶ 121, 130. Further, "[t]oday[,] most if not all gasoline pumped into the RFG areas of the Affected States is laced with high concentrations (11 to 15 percent) of MTBE." *Id.* ¶ 135.

Plaintiffs allege that defendants were uniquely aware of the dangers posed to private well owners. Despite this knowledge, they allegedly marketed the product without warning anyone, including the "[p]laintiffs, the public, public officials and [d]ownstream [h]andlers", of these dangers. *Id.* ¶¶ 197–99. These allegations are sufficient to demonstrate that defendants owed plaintiffs a duty to issue warnings when marketing and/or selling gasoline containing MTBE.[49]

### b. Proximate Cause

Plaintiffs allege that

**49.** Plaintiffs do not assert that defendants were required to issue warnings to "the world" or even directly to private well owners, nor does that seem feasible. Indeed, in certain circumstances, a manufacturer may escape liability for failure to warn if adequate warnings are given to the immediate vendee of the product. *See Hunnings,* 29 F.3d at 1485 ("[I]n appropriate circumstances, [a manufacturer may] discharge its duty by passing the requisite information down the chain of distribution...."); *Venus,* 82 Ill.Dec. 143, 468 N.E.2d at 409 ("[I]n most cases, [a manufacturer's duty to warn] can be fulfilled by discovering the danger and giving warning thereof to the next party in the chain of distri-

[d]efendants' failure to warn ... proximately caused reasonably foreseeable injuries to [p]laintiffs. Had [d]efendants provided sufficient warnings, MTBE would not have gained approval in the marketplace for use in gasoline and/or gasoline containing MTBE would have been treated different[ly] in terms of procedures, for handling, storage, emergency response and/or environmental clean-up. Since the source of MTBE in all contaminated wells and groundwater is gasoline, the absence of warnings was the proximate cause of all such contamination.

MC ¶ 200. Because the source of MTBE in all contaminated wells and groundwater is gasoline, it follows that defendants' action in placing gasoline containing MTBE in the stream of commerce was the cause of plaintiffs' injury. Thus, if plaintiffs can prove that the failure to issue warnings would have affected the market's acceptance of MTBE, or caused gasoline containing MTBE to be treated differently with respect to the handling, storage, emergency response and/or environmental clean-up, they may be able to demonstrate that defendants' failure to warn proximately caused their injuries. While the plaintiffs have an uphill battle, their theories of proximate causation are not so speculative as to warrant dismissal at this time.[50]

bution."). It is too early in these proceedings to address the content of any warnings, if any were indeed required, or in what manner or to whom such warnings should have been given.

**50.** Defendants also argue that because it is common knowledge that gasoline must be handled with care and there are state statutes regulating gasoline spills and leakages, any lack of warnings concerning the specific dangers associated with gasoline containing MTBE cannot be a legal cause of injuries resulting from the use of such gasoline. However, plaintiffs have alleged that the use of MTBE creates special hazards that are not

For the reasons discussed above, defendants' motions to dismiss plaintiffs' failure to warn claims are denied.

### 3. Public Nuisance

 Defendants have moved to dismiss plaintiffs' public nuisance cause of action on several grounds. *First,* defendants argue that plaintiffs have not alleged that defendants have "released" MTBE on or near their properties and the mere manufacture and sale of MTBE does not subject defendants to nuisance liability. *Second,* defendants argue that plaintiffs have failed to allege interference with a right common to the general public, nor have plaintiffs alleged they have suffered a special injury distinct from that suffered by the public at large. *Third,* defendants assert that their use of MTBE was authorized under the RFG Program and therefore such use cannot be considered a nuisance.

 A public nuisance is defined as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1). Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

> (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Id.* § 821B(2). In addition, in order to state a claim for public nuisance "one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." *Id.* § 821C(1). All of the relevant jurisdictions are essentially in accord with the Restatement.[51]

---

commonly known to plaintiffs, downstream handlers, or the public, and had warnings been given with respect to these special hazards, gasoline containing MTBE would have been handled with more care. *See* MC ¶¶ 37, 48–54, 195–201. At this stage, plaintiffs' allegations must be accepted as true.

**51.** In California, "nuisance" is statutorily defined as "[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway[.]" Cal. Civ.Code § 3479. A "public nuisance" is further defined as "[a nuisance] which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ.Code § 3480. In Florida, a public nuisance is classified as something that causes an "annoyance to the community or harm to public health." Fla. Stat. § 823.01. The Illinois Supreme Court has defined a public nuisance as "the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public." *Village of Wilsonville v. SCA Servs., Inc.,* 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824, 834 (1981). In Illinois, the requirements for stating a claim for public nuisance are "not strenuous because the 'concept of common law public nuisance elude[s] precise definition' and the existence of a nuisance 'depends on the peculiar facts presented by each case.'" *Gilmore v. Stanmar Inc.,* 261 Ill.App.3d 651, 199 Ill. Dec. 189, 633 N.E.2d 985, 993 (1994) (citations omitted). In New York, a public nuisance is "conduct or omissions which offend,

### a. Defendants' Participation in the Nuisance

Although defendants argue that they cannot be held liable for public nuisance because they had no control over the product at the time it was "released" onto plaintiffs' property, "[o]ne is subject to liability for a nuisance caused by an activity, not only when [it] carries on the activity but also when [it] participates to a substantial extent in carrying it on." Restatement (Second) of Torts § 834; *see also Selma Pressure Treating Co., Inc. v. Osmose Wood Preserving, Inc.*, 221 Cal. App.3d 1601, 1619–20, 271 Cal.Rptr. 596 (Cal.Ct.App.1990) ("[A]ny person creating or assisting to create and maintain the nuisance was liable to be sued for its abatement and for damages") (quoting *Hardin v. Sin Claire*, 115 Cal. 460, 463, 47 P. 363 (1896)); *Penn Central Transp. v. Singer Warehouse & Trucking Corp.*, 86 A.D.2d 826, 447 N.Y.S.2d 265, 267 (1st Dep't 1982).

In support of their position, defendants rely on *Bubalo v. Navegar, Inc.*, No. 96 C 3664, 1998 WL 142359 (N.D.Ill. Mar. 20, 1998), which found that a manufacturer could not be held liable for public nuisance for designing, marketing, and selling guns (legal and non-defective products) that were targeted to appeal to criminals. *See id.* at *4–5. The nuisance in that case involved the interference with the public's right to be free from injury from the use of powerful assault weapons by criminals. *See id.* at *4. Although the defendants allegedly did more than "merely manufacture and [sell]" the guns by targeting

criminals as the final users, the court dismissed the public nuisance claim. *Id.* In reaching its decision, the *Bubalo* court relied on the reasoning of a Seventh Circuit case, *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611 (7th Cir.1989). In that case, a PCB manufacturer sold PCB's to a third-party, who in turn discharged waste containing PCB's into the sewer system. The court held that the manufacturer could not be held liable for public nuisance, noting that once the manufacturer became aware of the risks associated with PCB's, the manufacturer made every effort to have the third-party dispose of the chemicals safely. *See id.* at 613–15.

Unlike the manufacturer in *City of Bloomington*, plaintiffs in the present actions allege that the defendants had knowledge of the dangers of the product, failed to warn anyone of these dangers, and actively conspired to conceal the threat caused by MTBE. Although the *Bubalo* court dismissed the public nuisance claims against the gun manufacturers, it specifically stated:

> Suppose, however, that [the manufacturer in *City of Bloomington* ] had not taken steps to alert customers of the risks of the product, or intentionally marketed the product to customers who it knew or should have known would dispose of PCB's in a manner that would harm the environment. Nothing in the opinion in *City of Bloomington* would preclude the imposition of liability on the manufacturer under those facts.

interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals or interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.S.2d 564, 567, 394

N.Y.S.2d 169, 362 N.E.2d 968 (1977). The Second Circuit has held that "the release or threat of release of hazardous waste into the environment unreasonably infringes upon a public right and thus is a public nuisance as a matter of New York law...." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1051 (2d Cir.1985).

*Bubalo,* 1998 WL 142359, at *4. Further, a recent New York court noted

> there must be some circumstances under which a defendant can be held liable for common law public nuisance when its conduct results in ... interference [with a common right], even if another party, not within the defendant's control, contributes to the nuisance. To hold otherwise would defeat much of the purpose of the cause of action.

*People v. Sturm, Ruger & Co., Inc.,* No. 402586/00 (Sup.Ct.N.Y.Co. Aug. 10, 2001) (pagination unavailable).[52] Here, plaintiffs' allege that defendants have extensive knowledge of all phases of the petroleum business, from the extraction of crude oils, to the refining and/or distribution, marketing and retail sale of gasoline, including the design and manufacture of gasoline containing MTBE. *See* MC ¶¶ 5, 6. Defendants added MTBE to gasoline, marketed and distributed gasoline containing MTBE, all with the knowledge of the dangers MTBE poses to groundwater. *See id.* ¶¶ 41–43, 56–98. In addition, plaintiffs allege that defendants failed to warn the downstream handlers, retailers, gasoline purchasers, government officials and well owners of the dangers associated with MTBE. *See id.* ¶¶ 134, 153, 157. According to the plaintiffs, defendants marketed and promoted the use of MTBE by misrepresenting its chemical properties, *see id.* ¶¶ 126–29, and actively conspired to conceal the threat posed by MTBE. *See id.* ¶¶ 99–129. These allegations are sufficient to demonstrate defendants' participation and assistance in the creation of a nuisance.

### b. The Public Right and Special Injury Requirement

Plaintiffs have alleged that MTBE threatens the public's right to pure water. *See id.* ¶ 213. It is beyond cavil that the public has a right to soil and water that is free from environmental contamination. *See State v. Schenectady Chemicals, Inc.,* 117 Misc.2d 960, 459 N.Y.S.2d 971, 978 (1983) ("The common law rule has long been that water, like air, is an element in which no person can have an absolute property, yet, it is also, like air, free for the use of all, and the law has been diligent and rigorous to maintain it in its natural purity.") (quotation marks and citation omitted). Plaintiffs, who rely on their wells for their drinking and household water, have alleged that the MTBE contamination of their groundwater has caused a "serious interference with the use, benefit and/or enjoyment of their properties[.]" MC ¶¶ 209. Plaintiffs further allege that "[m]uch of the population of the Affected States is served from surface water that is not susceptible to the problems caused by MTBE to groundwater." *Id.* ¶ 210. Also, public water supplies that rely on groundwater are monitored for safety, unlike plaintiffs' private wells. *See id.* Plaintiffs' injuries are plainly distinct in both degree and kind from the injuries suffered by the public at large. Thus, plaintiffs have alleged the requisite special injury necessary to support their public nuisance claim.

### c. Authorization to Use MTBE

Finally, defendants argue that, even assuming their conduct constitutes a nui-

---

52. Although the *Sturm* court dismissed plaintiffs' public nuisance claim arising from the manufacture and distribution of handguns, it did so because the complaint did not allege conduct on the part of the defendants demonstrating a tortious connection to the alleged nuisance, nor did plaintiffs allege that the guns were defective products. Here, plaintiffs have alleged both tortious conduct on the part of the defendants and that gasoline containing MTBE is a defective product.

sance, the use of gasoline containing MTBE has been authorized by Congress and the EPA and therefore defendants cannot be subject to tort liability. However, as noted in the preemption discussion, neither Congress' expectation that MTBE would be used to meet the RFG requirements, nor the EPA's certification of gasoline containing MTBE, shield defendants from liability.

Because plaintiffs have alleged facts sufficient to state a claim for public nuisance, the defendants' motions to dismiss Count IV are denied.

### 4. NY GBL § 349—Deceptive Business Acts and Practices [53]

■ Section 349 of the GBL states, in relevant part:

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

(h) [A]ny person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.

GBL § 349(a) and (h). In order to assert a claim under section 349 of the GBL, plaintiffs must allege that (1) defendants engaged in conduct that is deceptive or misleading in a material way; (2) the deceptive conduct was "consumer-oriented"; and (3) plaintiffs have been injured "by reason of" defendants' conduct. *See Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 293, 690 N.Y.S.2d 495, 712 N.E.2d 662 (1999). Defendants argue that plaintiffs'

claims must be dismissed because (1) the alleged deceptive conduct for which they seek redress does not fall within the ambit of the statute; and (2) plaintiffs' injuries did not arise by reason of any alleged violation.

#### a. The Ambit of GBL § 349— "Consumer–Oriented" Transactions

"[A]t its core", section 349 "is a consumer protection device." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995) (citing *Genesco Entm't v. Koch*, 593 F.Supp. 743, 751 (S.D.N.Y. 1984)). Prior to 1980, the Attorney General was the sole party who could enforce the prohibitions of section 349. " '[R]ecognizing the need for private enforcement,' however, the New York Legislature ... 'granted individuals the right to sue for injuries resulting from consumer fraud.' " *Genesco*, 593 F.Supp. at 751 (quoting 1980 McKinney's Session Laws 1867 (Memorandum of Governor Hugh Carey)). "The statute was intended to empower consumers; to even the playing field in their disputes with better funded and superiorly situated fraudulent businesses." *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 630 N.Y.S.2d 769, 774 (2d Dep't 1995). In *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995), the New York Court of Appeals held that parties claiming the benefit of section 349 must charge conduct that is consumer oriented—conduct that has a broad impact on consumers at large.

■ While the typical case under section 349 generally involves claims arising directly out of a commercial transaction between a plaintiff consumer and a defendant seller, neither the text of the statute

---

**53.** Because *La Susa* has been dismissed for lack of standing, this cause of action only

applies to the plaintiffs in the *Berisha* and *Berrian* actions.

nor the case law establishes this requirement. The phrase "commercial transaction" can be found nowhere in the plain language of the statute, and section 349(h) specifically empowers "[a]ny person who has been injured by reason of any violation of this section" to bring an action. GBL § 349(h). Indeed, "[t]here is no requirement of privity, and victims of indirect injuries are permitted to sue under the Act." *See Vitolo v. Dow*, 166 Misc.2d 717, 724, 634 N.Y.S.2d 362 (1995), *aff'd in relevant part*, 234 A.D.2d 361, 651 N.Y.S.2d 104 (2d Dep't 1996). Courts have held that business competitors, in certain instances, may bring actions against their competitors under the statute for deceptive practices, noting that "[t]he critical question [under section 349] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." *Securitron*, 65 F.3d at 264 (holding that a business competitor could bring an action under the statute as long as the conduct affected the public interest in New York).

■ While plaintiffs do not allege that their injuries were directly caused by a specific commercial transaction with any particular defendant, they have alleged that defendants are engaged in the business of providing gasoline containing MTBE to consumers, *including plaintiffs*, in the State of New York; *see* MC ¶¶ 5, 203; gasoline is stored by nearly every person in the United States, creating potential for mishandling events; *see id.* ¶ 59; defendants were aware that gasoline containing MTBE escapes into the environment during distribution and sale, and through "consumer overfill", *see id.* ¶ 58; defendants were aware that spills of gasoline containing MTBE have resulted in groundwater and private well contamina-

tion, *see id.* ¶¶ 72–81; defendants were aware of hazards associated with MTBE but sought to suppress them, *see id.* ¶¶ 82–89; and despite this knowledge, defendants distributed pamphlets and made other misrepresentations in order to mislead the public and garner consumer acceptance of gasoline containing MTBE. *See id.* ¶¶ 99, 123–29. This alleged conduct affects the public interest in New York and is sufficiently consumer-oriented to state a claim under the statute.

### b. Plaintiffs' Injuries: The "By Reason Of" Requirement

■ To satisfy the "by reason of" requirement, plaintiffs need only allege that "the defendant[s'] 'material deceptive act[s]' caused the injury." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000) (quoting *Oswego*, 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741). Whether plaintiffs relied on the alleged deceptive conduct is irrelevant because "[r]eliance is *not* an element of a section 349 claim." *Stutman*, 95 N.Y.2d at 30, 709 N.Y.S.2d 892, 731 N.E.2d 608 (emphasis in original). Further, plaintiffs' allegations are sufficient to show that defendants' conduct misled all consumers, including plaintiffs, as to the dangers and safety concerns of gasoline containing MTBE. Therefore, plaintiffs have satisfied their burden by pleading that defendants' deceptive conduct caused their wells to be contaminated. *See id.* (finding that an allegation that defendants' conduct caused plaintiff's injury was sufficient to satisfy the causation requirement for purposes of a motion to dismiss).

For these reasons, defendants' motions to dismiss plaintiffs' claims under section 349 of the GBL are denied.[54]

---

**54.** Defendants also argue that pursuant to section 349(d) of the GBL, plaintiffs' claims

are expressly preempted because the EPA has "allowed" the use of MTBE as a gasoline

### 5. Concert of Action and Civil Conspiracy

Plaintiffs seek to hold defendants jointly and severally liable under the theory of concert of action. Plaintiffs further seek to hold defendants liable for engaging in a conspiracy to market a defective product. Defendants argue that plaintiffs can do neither because (1) plaintiffs have failed to allege sufficient facts demonstrating an agreement among the defendants to participate in a tortious act; and (2) plaintiffs have failed to allege an underlying intentional tort.

### a. The Applicability of Concert of Action Liability

The threshold question is whether plaintiffs can rely on the theory of concert of action to hold the defendants jointly and severally liable without identifying the defendant or defendants that manufactured the MTBE contaminating their wells. As noted earlier, the concert of action theory permits a defendant to be held jointly and severally liable if it commits a tortious act in concert with another or pursuant to a common design, or a defendant gives substantial assistance to another knowing that the other's conduct constitutes a breach of duty. *See Smith,* 148 Ill.Dec. 22, 560 N.E.2d at 329; *see also* Restatement (Second) of Torts § 876. The paradigmatic case is a drag race where one driver is the cause-in-fact of plaintiff's injury but the other racer is also liable for the injury because their joint misbehavior contributed to the accident. *See Marshall v. Celotex Corp.,* 691 F.Supp. 1045, 1047 (E.D.Mich.1988).

While some courts have held that the concert of action theory is inapplicable when the plaintiff cannot identify which defendant is the cause-in-fact of injury, *see, e.g., Santiago v. Sherwin–Williams Co.,* 794 F.Supp. 29, 32–33 (D.Mass.1992) (rejecting application of concert of action liability to Massachusetts lead-based paint case); *Marshall,* 691 F.Supp. at 1047 (concert of action theory not fashioned to ease plaintiff's burden of proving causation), other courts have indicated that under certain circumstances the concert of action theory may operate to bypass the traditional identification requirement. *See, e.g., Hymowitz,* 541 N.Y.S.2d at 945, 539 N.E.2d 1069 ("[T]he accepted tort doctrines of alternative liability and concert of action are available in some personal injury cases to permit recovery where the precise identification of a wrongdoer is impossible."); *Abel v. Eli Lilly & Co.,* 418 Mich. 311, 343 N.W.2d 164, 176 (1984) (finding concert of action may be applicable in DES litigation). Although each of the relevant jurisdictions has refused to apply the doctrine in the context of DES litigation, the primary reason for rejecting the theory was plaintiffs' failure to show that the defendants had a tacit understanding and common plan to commit a tortious act—thus making it unfair to hold any one manufacturer jointly and severally liable for the defective products of the entire industry. *See Sindell,* 163 Cal.Rptr. 132, 607 P.2d at 931–34; *see also Conley,* 570 So.2d at 280 (adopting the lower court's reasoning for rejecting the theory in the context of DES litigation); *Smith,* 148 Ill.Dec. 22, 560 N.E.2d at 330 (citing cases rejecting the application of concert of action in the context of DES litigation); *Hymowitz,* 541 N.Y.S.2d at 946–47, 539 N.E.2d 1069 (finding that nothing in the record demonstrated an unlawful agreement existed between the DES manufacturers). As discussed below in conjunction

additive. However, for the reasons stated in the preemption discussion, this argument is unpersuasive.

with the conspiracy claim, plaintiffs have sufficiently alleged that defendants committed tortious acts pursuant to an understanding and common plan. Accordingly, without further discovery, it would be inappropriate to exclude the concert of action theory as a possible basis of liability.

### b. Civil Conspiracy

 In each of the relevant jurisdictions a claim for civil conspiracy is not an independent tort, but rather, a derivative claim of an underlying substantive tort. *See Belkow v. Celotex Corp.*, 722 F.Supp. 1547, 1550 (N.D.Ill.1989); *Carlson v. Armstrong World Indus., Inc.*, 693 F.Supp. 1073, 1078 (S.D.Fla.1987); *Kidron v. Movie Acquisition Corp.*, 40 Cal.App.4th 1571, 1581, 47 Cal.Rptr.2d 752 (Cal.Ct.App. 1995); *Cresser v. American Tobacco Co.*, 174 Misc.2d 1, 662 N.Y.S.2d 374, 378 (1997). The elements of civil conspiracy in each of the relevant jurisdictions are: (1) an agreement to participate in an unlawful act or a lawful act in an unlawful means; (2) an overt act performed in furtherance of the scheme; and (3) an injury caused by the overt act. *See Sain v. Nagel*, 997 F.Supp. 1002, 1017 (N.D.Ill.1998); *Kidron*, 40 Cal.App.4th at 1581, 47 Cal.Rptr.2d 752; *Bond v. Koscot Interplanetary Inc.*, 246 So.2d 631, 635 (Fla.Dist.Ct.App.1971); *Lindsay v. Lockwood*, 163 Misc.2d 228, 234, 625 N.Y.S.2d 393 (1994). A claim for civil conspiracy is "merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible ... for any overt act or acts." *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir.1956); *see also Adcock v. Brakegate,*

*Ltd.*, 164 Ill.2d 54, 206 Ill.Dec. 636, 645 N.E.2d 888, 894 (1994) ("The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's act.").

### i. The Underlying Tort

Defendants argue that the civil conspiracy claim and concerted action theory of liability must fail because plaintiffs have not pled an underlying intentional tort. Plaintiffs argue that they need not allege an underlying intentional tort because the element of intent is satisfied by each defendant's knowing and intentional participation in the conspiracy, but even if an intentional tort is required, plaintiffs have pled a willful failure to warn.

 Logic dictates that parties cannot conspire or agree to commit negligence. *See Sonnenreich v. Philip Morris, Inc.*, 929 F.Supp. 416, 419 (S.D.Fla.1996) ("[l]ogic and case law dictate that a conspiracy to commit negligence is a non sequitur"); *Rogers v. Furlow*, 699 F.Supp. 672, 675 (N.D.Ill.1988) (a conspiracy to commit negligence is "a paradox at best"); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 720, n. 2 (Tex.1995) ("[g]iven the requirement of specific intent, parties cannot [agree to] engage in a civil conspiracy to be negligent"). *Cresser*, 662 N.Y.S.2d at 378–79 (cannot conspire or act in concert to commit negligence).

 However, plaintiffs have sufficiently alleged that defendants' failure to warn was willful.[55] Plaintiffs further al-

---

55. A failure to warn can be either negligent or willful. *See Cresser*, 662 N.Y.S.2d at 379; *see also Miles v. S.C. Johnson & Son, Inc.*, No. 00 C 3278, 2001 WL 640180, at *1 (N.D.Ill. May 29, 2001) (the elements of willful and wanton conduct in a product liability case include knowledge of the defect, knowledge or notice that the defect was likely to cause injury and

failure to warn of or remedy a known defect or take some other affirmative action to avoid the injury). An assessment of whether a party's conduct is willful rather than negligent involves a determination of whether the party has committed intentional acts of "unreasonable character in disregard of a known or obvious risk that was so great so as to make it

lege that defendants conspired to market a product they knew to be unreasonably dangerous and intentionally misrepresented and suppressed information about MTBE. *See* MC ¶¶ 2, 82–137, 228–32. While the law is not clear on whether a civil conspiracy claim may be based on a cause of action for strict liability, because plaintiffs allege that defendants marketed the alleged defective product intentionally, the strict liability claim for design defect may support the conspiracy claim. *See Sackman v. Liggett*, 965 F.Supp. 391, 395–96 (E.D.N.Y.1997) (denying defendants' motion to dismiss a civil conspiracy claim where the plaintiff alleged a conspiracy to market a defective product).

### ii. An Unlawful Agreement

Defendants also argue that plaintiffs have failed to sufficiently allege an unlawful agreement. At most, defendants assert, plaintiffs' allegations merely demonstrate that they engaged in "parallel activity"—allegations that are insufficient to support a civil conspiracy claim or concerted action liability. While plaintiffs do not disagree with this principle of law, they argue that they have alleged more than parallel activity.

The agreement is "a necessary and important" element of a civil conspiracy claim. *Adcock*, 206 Ill.Dec. 636, 645 N.E.2d at 894. Accidental, inadvertent, or negligent participation in a common scheme does not amount to a conspiracy. *See id.* However, "a defendant who understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly to do its part to further those objectives ... is liable as a conspirator." *Id.* Although bare allegations are insufficient to support a

conspiracy claim or concerted action liability, courts have recognized the difficulty of pleading with specificity the facts necessary to show the existence of an unlawful agreement. *See id.* at 895 ("Such actions, by their very nature, do not permit ... plaintiff[s] to allege, with complete particularity, all of the details of the conspiracy or the exact role of the defendants in the conspiracy.") (citation omitted); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir.1999) ("As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence."); *In re Sunset Bay Assocs.*, 944 F.2d 1503 (9th Cir.1991) (an express agreement need not be shown, only a tacit understanding).

Without repeating the specific factual allegations, plaintiffs have alleged that defendants conspired to market a product they knew to be dangerous to the environment and intentionally failed to warn downstream handlers, government officials and the public as to the threat caused by MTBE. *See* MC ¶¶ 99–137, 195–201, 228–32. More importantly, plaintiffs allege defendants formed joint task-forces and committees such as the MTBE Committee and the OFA for the specific purpose of suppressing or minimizing information regarding MTBE hazards. *See id.* ¶¶ 82–90, 108, 123–29. Defendants also engaged in joint activity to deceive the government as well as the public regarding these same dangers. *See id.* Plaintiffs further allege that defendants' conspiracy and the acts taken in furtherance of the conspiracy are a direct and proximate cause of the MTBE contamination of their wells.

highly probable that harm would follow...." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on Law of Torts § 117, at

857 (5th ed.1984). Plaintiffs' allegations are sufficient to meet this standard.

Plaintiffs are not required to allege the specific facts surrounding the conspiracy at this stage of the litigation where "the necessary information [may be] within the knowledge and control of the defendant[s]...." *Adcock,* 206 Ill.Dec. 636, 645 N.E.2d at 895. Thus, plaintiffs' allegations of an agreement or tacit understanding are sufficient to support their conspiracy claims and concerted action theory of liability.

For these reasons, defendants' motions to dismiss the conspiracy claims and concerted action theory of liability are denied.

## VI. CONCLUSION

To summarize:

1. *La Susa:* The *La Susa* action is dismissed for lack of standing.

2. *England:* The claims of Bauer and McMannis are dismissed for lack of standing. Christiansen, the California plaintiff, may proceed under the market-share and concert of action theories of liability. England and Aylward, the Illinois plaintiffs, may proceed under the concert of action theory of liability. Defendants' motions to dismiss the strict liability, negligence, failure to warn, public nuisance, and conspiracy claims are denied.

3. *Berisha:* Plaintiffs in this action may proceed under the market-share and concert of action theories of liability. Defendants' motions to dismiss the strict liability, negligence, failure to warn, public nuisance, GBL and conspiracy claims are denied.

4. *Young:* Young may proceed under the market-share (only for those claims sounding in negligence) and concert of action theories of liability. Defendants' motions to dismiss the strict liability, negligence, failure to warn, public nuisance, and conspiracy claims are denied.

5. *Berrian:* Plaintiffs in this action may proceed under the market-share and concert of action theories of liability. Defendants' motions to dismiss the strict liability, negligence, failure to warn, public nuisance, GBL and conspiracy claims are denied.

A conference is scheduled for September 24, 2001 at 4:30 p.m.

SO ORDERED.